**EXHIBIT A**

NAI-1514329316v6

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-31602 (JCW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING CONFIRMATION OF THE JOINT PLAN
OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC.
AND HANSON PERMANENTE CEMENT, INC., AS MODIFIED**

---

[1]   The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

## TABLE OF CONTENTS

**Page**

I.    FINDINGS OF FACT................................................................................................ 5

    A.    HISTORY OF THE DEBTORS' ASBESTOS PERSONAL INJURY AND
        ENVIRONMENTAL LIABILITIES ........................................................... 5

        1.    Background........................................................................................ 5

        2.    General Overview of the Debtors' Manufacture and Sale of
             Products Alleged to Contain Asbestos....................................... 6

        3.    History of the Debtors' Asbestos Personal Injury Litigation ..................... 7

        4.    Asbestos Personal Injury Insurance and Coverage Litigation ................... 8

        5.    The Debtors' Environmental Liabilities........................................ 9

        6.    Environmental Insurance ................................................................ 10

    B.    PREPETITION DISCUSSIONS WITH REPRESENTATIVES OF
        ASBESTOS CLAIMANTS ....................................................................... 10

    C.    DEBTORS' DECISION TO FILE THE REORGANIZATION CASES ............ 11

    D.    APPOINTMENT OF THE CREDITORS' COMMITTEE, THE
        ASBESTOS PERSONAL INJURY COMMITTEE AND FUTURE
        CLAIMANTS' REPRESENTATIVE ....................................................... 12

    E.    RESOLUTION OF THE REORGANIZATION CASES.................................. 12

        1.    Settlement Regarding Asbestos Personal Injury Claims ........................ 12

        2.    Settlements Regarding Environmental Claims ....................................... 13

        3.    Settlement with Lehigh Hanson................................................... 16

        4.    Sufficient Funds to Pay All Allowed General Unsecured Claims........... 16

    F.    MODIFICATIONS TO THE PLAN ..................................................... 17

    G.    COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF
        THE BANKRUPTCY CODE................................................................... 17

        1.    Section 1129(a)(1) — Compliance of the Plan with Applicable
             Provisions of the Bankruptcy Code .......................................... 17

        2.    Section 1129(a)(2) — Compliance with Applicable Provisions of
             the Bankruptcy Code................................................................. 22

        3.    Section 1129(a)(3) — Proposal of the Plan in Good Faith..................... 22

        4.    Section 1129(a)(4) — Court Approval of Certain Payments as
             Reasonable ...................................................................... 27

**TABLE OF CONTENTS**
(continued)

**Page**

5.     Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy .................................................................................................. 28

6.     Section 1129(a)(6) — Approval of Rate Changes .................................. 28

7.     Section 1129(a)(7) — Best Interests of Holders of Claims and Interests ................................................................................................. 28

8.     Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class ...................................................................................................... 29

9.     Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code ............................... 29

10.     Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class ................................................................................. 30

11.     Section 1129(a)(11) — Feasibility of the Plan ....................................... 30

12.     Section 1129(a)(12) — Payment of Bankruptcy Fees ............................ 32

13.     Section 1129(a)(13) — Retiree Benefits ................................................ 32

14.     Section 1129(d) — Purpose of Plan ....................................................... 32

H.     THE ASBESTOS PERSONAL INJURY TRUST AND THE ASBESTOS PERMANENT CHANNELING INJUNCTION COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE ......................................... 32

1.     The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code ................................... 32

2.     The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code .................................. 36

3.     The Extension of the Asbestos Permanent Channeling Injunction to Third Parties Is Appropriate ................................................................ 40

4.     The Rights of Persons That Might Subsequently Assert an Asbestos Personal Injury Claim That Is a Demand Addressed by the Asbestos Permanent Channeling Injunction and Transferred to the Asbestos Personal Injury Trust Were Represented by the Future Claimants' Representative ............................................................. 42

5.     Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants ........................... 43

I.     COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES .......................................................................................... 45

J.     SATISFACTION OF CONDITIONS TO CONFIRMATION ........................... 45

-ii-

## TABLE OF CONTENTS
(continued)

**Page**

K.  THE PLAN IS INSURANCE NEUTRAL ........................................................ 51

1.  Truck Has No Interest in the Asbestos Personal Injury Trust ................. 53

2.  Even If it Had Standing, Truck's Arguments about the Plan's Treatment of Its Breach Claim Are Overruled ...................................... 53

L.  TRUCK'S COURSE OF CONDUCT BEFORE THE BANKRUPTCY COURT ........................................................................................................ 55

II.  CONCLUSIONS OF LAW ..................................................................................... 57

A.  JURISDICTION AND VENUE .......................................................................... 57

B.  APART FROM ISSUES RELATED TO INSURANCE NEUTRALITY, TRUCK LACKS STANDING TO OBJECT TO THE PLAN ........................... 58

C.  ENTRY OF THE PLAN FINDING IS PROPER ................................................ 59

1.  Truck Has Received All Necessary Procedural Protections ................... 59

2.  As a Matter of Law, the Debtors' Acts and/or Omissions Leading Up to and During the Reorganization Cases Did Not Breach the Assistance and Cooperation Clause or Any Other Express Provision of the Truck Policies ................................................................ 61

3.  As a Matter of Law, the Debtors' Acts and/or Omissions Leading Up to And During the Reorganization Cases Did Not Breach the Covenant of Good Faith and Fair Dealing Implied Into the Truck Policies ................................................................................................... 66

D.  MODIFICATIONS TO THE PLAN .................................................................... 68

E.  EXEMPTIONS FROM TAXATION .................................................................. 68

F.  COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE ...... 69

G.  COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE ................................................................................................................ 69

H.  TRANSFER OF BOOKS AND RECORDS TO THE ASBESTOS PERSONAL INJURY TRUST .......................................................................... 69

I.  APPROVAL OF THE SETTLEMENTS AND RELEASES PROVIDED UNDER THE PLAN ........................................................................................... 70

III.  CONCLUSION ......................................................................................................... 70

-iii-

**INTRODUCTION**

WHEREAS, Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. (together, the "Debtors" and, as reorganized entities after emergence, the "Reorganized Debtors") proposed the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., dated October 14, 2019 [Conf. Exhibit 1][2] (as amended by the modifications set forth in the blackline of the Plan in Exhibit B attached to the Confirmation Order, and as may be further amended, the "Plan");[3]

WHEREAS, on October 23, 2019, the Bankruptcy Court signed its Order (I) Approving the Debtors' Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Plan of Reorganization and (III) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice Procedures [Conf. Exhibit 16] (the "Disclosure Statement Order"), by which the Bankruptcy Court, among other things, approved the Debtors' proposed disclosure statement (the "Disclosure Statement"), established procedures for the solicitation and tabulation of votes to accept or reject the Plan and scheduled a hearing to consider Confirmation of the Plan for March 30, 2020, which hearing was continued to and held on July 20, 2020 and July 22,

---

[2]     "D.I." refers to docket entries in the Debtors' lead bankruptcy case, 16-31602.

[3]     Capitalized terms and phrases used herein have the meanings given to them in the Plan.  The rules of interpretation set forth in Section I.B.1 of the Plan apply to these Findings of Fact and Conclusions of Law (the "Findings and Conclusions") and to the order confirming the Plan (the "Confirmation Order"), which is being issued concurrently herewith.  In addition, in accordance with Section I.A of the Plan, any term used in the Plan, these Findings and Conclusions or the Confirmation Order that is not defined in the Plan, these Findings and Conclusions or the Confirmation Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  A copy of the Plan (without the exhibits thereto) is attached to the Confirmation Order as Exhibit A and is incorporated herein by reference.

2020, with the Bankruptcy Court giving its oral ruling on August 13, 2020 (the "Confirmation Hearing");

WHEREAS, affidavits of service were executed by Prime Clerk LLC, the Bankruptcy Court-appointed notice, claims and solicitation agent ("Prime Clerk"), with respect to the mailing of notice of the Confirmation Hearing and solicitation materials in respect of the Plan in accordance with the Disclosure Statement Order (collectively, the "Affidavits of Service") and were filed with the Bankruptcy Court [D.I. 1892, 1904, 1911, 1938, 1947, 1948, 2007, 2042, 2168, 2172, 2178];[4]

WHEREAS, the Declaration of Anna Jadonath [D.I. 1903] (the "Publication Declaration") was filed with the Bankruptcy Court on November 14, 2019, regarding the publication of the Notice of (I) Deadline for Casting Votes to Accept or Reject Proposed Joint Plan of Reorganization, (II) Hearing to Consider Confirmation of Proposed Joint Plan of Reorganization and (III) Related Matters and/or the other forms of publication notice approved by the Bankruptcy Court as set forth in the Disclosure Statement Order;

WHEREAS, the Declaration of Cameron R. Azari, Esq. on Implementation of Notice Regarding the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. [Conf. Exhibit 21] (the "Notice Declaration") was filed with the Bankruptcy Court on July 1, 2020, attesting to publication notice of the Plan;

WHEREAS, the Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. [Conf.

---

[4]   The Affidavits of Service were filed on November 6, 2019, November 14, 2019, November 20, 2019, December 17, 2019, January 2, 2020, January 6, 2020, February 7, 2020, February 14, 2020, March 24, 2020, March 30, 2020 and April 20, 2020.

Exhibit 20] (the "Voting Agent Declaration") was filed with the Bankruptcy Court on July 1,

2020, attesting to the results of the tabulation of the properly executed and timely received

Ballots for the Plan as follows:

> **Class 4 Claimants.**  The Debtors received 24,310 acceptances out of 24,310 votes from holders of Class 4 Asbestos Personal Injury Claims, with Class 4 claimants who voted in favor of the Plan holding Claims in the amount of $2,439,570,176.00 for voting purposes only, such acceptances being 100 percent in number and 100 percent in amount of all ballots received from holders of Class 4 Asbestos Personal Injury Claims (Voting Agent Decl. ¶ 10.);

WHEREAS, the Debtors made non-material modifications to the Plan, which are

set forth in Exhibit B attached to the Confirmation Order (collectively, the "Modifications");

WHEREAS, Truck Insurance Exchange ("Truck") filed an objection to the Plan

[D.I. 2070] and a consolidated response to the Plan Proponents' briefing [D.I. 2359] (together,

the "Objection"), as well as various affidavits in support of its Objection [Conf. Exhibits 37, 65-

67];

WHEREAS, the Objecting Excess Insurers made the Objecting Excess Insurers'

Objections, and voluntarily withdrew them when the Plan was modified to insert, among other

things,  Section IV.M.3.a., entitled, "Settlement with Truck;"

WHEREAS, the Debtors filed a memorandum of law in support of Confirmation

of the Plan [D.I. 2275] and a reply to Truck's consolidated response [D.I. 2377], and the

Asbestos Personal Injury Committee (the "ACC") and the Future Claimants' Representative

(the "FCR") filed an omnibus reply in support of the Plan [D.I. 2274] and a joint reply to Truck's

consolidated response [D.I. 2376] (collectively, the "Memoranda of Law");

WHEREAS, the declarations of Kevin O'Neal Holdeman [Conf. Exhibit 23], John

D. Bittner [Conf. Exhibit 22], Charles E. McChesney II [Conf. Exhibit 19] and Lawrence

-3-

Fitzpatrick [Conf. Exhibit 18] were submitted in support of the Plan (collectively, the "Declarations");

WHEREAS, the Court has reviewed the Plan, the Disclosure Statement, the Disclosure Statement Order, the Voting Agent Declaration, the Affidavits of Service, the Publication Declaration, the Notice Declaration, the Memoranda of Law, the Declarations and the other pleadings before the Court in connection with the Confirmation of the Plan, including the objections filed to the Plan;[5]

WHEREAS, the Court has considered the arguments of counsel made on the record at the Confirmation Hearing;

WHEREAS, the Court has considered all evidence presented and admitted into the record at the Confirmation Hearing;

WHEREAS, the Court has taken judicial notice of the papers and pleadings on file in these Reorganization Cases, including any related adversary proceedings;

WHEREAS, the Court, after due deliberation and for sufficient cause, finds that the evidence admitted in support of the Plan at the Confirmation Hearing is persuasive and credible;

NOW, THEREFORE, the Court enters the following Findings of Fact and Conclusions of Law with respect to Confirmation of the Plan.[6]

---

[5]     Truck's Objection was the only unresolved objection as of the Confirmation Hearing.

[6]     The Bankruptcy Court made additional findings and conclusions on the record at the Confirmation Hearing, which findings and conclusions are adopted and fully incorporated herein.

I. **FINDINGS OF FACT.**[7]

    A. **HISTORY OF THE DEBTORS' ASBESTOS PERSONAL INJURY AND ENVIRONMENTAL LIABILITIES.**

        1. **Background.**

Debtor HPCI owns the Permanente Property, which consists of more than 3,400 acres of land that includes a cement plant, rock plant and quarry (including the minerals) located in Santa Clara County, California.  (McChesney Decl. ¶ 10.)  HPCI leases the Permanente Property to its non-debtor affiliate Lehigh Southwest Cement Company ("Lehigh Southwest"), pursuant to a July 1, 2008 Master Agreement Regarding Permanente Cement Plant, Quarry and Rock Plant and a July 1, 2008 Quarry Mineral Lease Agreement (together, the "Permanente Leases")  (Id.)  Under the Permanente Leases, HPCI receives rent, royalties and other payments from Lehigh Southwest, which, in turn, operates the cement plant, rock plant and quarry and assumes responsibility for the Permanente Property's operating costs.  (Id.)  The Permanente Leases further provide that HPCI is obligated to fund capital expenditures for the cement plant, quarry and rock plant, and reclamation obligations related to the quarry.  (Id.)  In accordance with an agreement reached with the ACC, the FCR and the Creditors' Committee, and as approved by the Bankruptcy Court in its April 10, 2017 Agreed Order Amending the Interim DIP Financing Order [Conf. Exhibit 24], HPCI has not been paying its obligations to fund capital

---

[7]    These Findings and Conclusions constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52.  Any finding of fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is referred to as a finding of fact.

expenditures and reclamation under the Permanente Leases, subject and without prejudice to Lehigh Southwest's right to accrue those ongoing obligations.  (Id.)

The Debtors are wholly-owned, indirect subsidiaries of Lehigh Hanson, Inc. ("Lehigh Hanson").  (Id. ¶ 9.)  Lehigh Hanson is not a Debtor in these Reorganization Cases. (Id.)  HPCI is the direct parent of Kaiser Gypsum, non-debtor Permanente Cement Company and two operating non-debtor subsidiaries,  Hanson Micronesia Cement, Inc. and Hanson Permanente Cement of Guam, Inc. (together, the "Operating Subsidiaries"), which distribute and sell cement in key markets in the Pacific region, including Saipan and Guam.  (Id.)  Lehigh Hanson provides the funding required by the Operating Subsidiaries.  (Id.)  Non-debtor Permanente Cement Company has no assets or operations.  (Id.)

Kaiser Gypsum currently has no material tangible assets or business operations, other than managing its significant, legacy asbestos-related and environmental liabilities described below.  (Id. ¶ 11.)  Under the Plan, the Debtors' non-debtor affiliate, Lehigh Cement Company LLC ("Lehigh Cement"), will transfer to Kaiser Gypsum its interests in certain real property located in Kosse, Limestone County, Texas and Kunkletown, Monroe County, Pennsylvania (together, the "Real Properties"), together with Lehigh Cement's rights under certain leases related to the Real Properties.  (Id.)  Based on the Projections, Kaiser Gypsum is expected to generate net cash flows of approximately $68,000 and $93,000 in 2020 and 2021, respectively.  (Bittner Decl. ¶ 30.)

> **2.  General Overview of the Debtors' Manufacture and Sale of Products Alleged to Contain Asbestos.**

Kaiser Gypsum's principal business consisted of manufacturing and marketing gypsum plaster, gypsum lath and gypsum wallboard.  (Declaration of Charles E. McChesney II in Support of First Day Pleadings [Conf. Exhibit 36] (the "First Day Declaration") ¶ 25.)

-6-

In connection with its wallboard business, Kaiser Gypsum marketed, manufactured and sold products categorized as "wallboard accessories," which included joint compounds, texture paints and other similar products used to laminate wallboard or cover radiant heat surfaces and cables. (McChesney Decl. ¶ 12.) Certain versions of these wallboard accessories included asbestos during varying time periods. (Id.) In addition to wallboard accessory products, Kaiser Gypsum manufactured mineral fiberboard products, which are used for acoustical ceiling tile and lay-in board that also contained asbestos. (Id.) By 1978, Kaiser Gypsum had sold substantially all its assets and ceased to be involved in any product manufacturing. (Id.)

HPCI's primary business was the manufacture and sale of Portland cement products, which is a fine powdery substance that is mixed with water and an aggregate, such as gravel or sand, to form concrete. (Id. ¶ 13.) HPCI made two types of products—"masonry cement," and "plastic cement"—that in certain versions and at certain times contained asbestos. (Id.)

### 3.  History of the Debtors' Asbestos Personal Injury Litigation.

The Debtors' asbestos-related liabilities arise from their manufacture and sale of certain products that contained asbestos. (McChesney Decl. ¶ 12.) Although asbestos was removed from each of the Debtor's products, the Debtors have been the subject of thousands of lawsuits. (Id. ¶ 14.) Since 1978, one or both of the Debtors have been named in more than 38,000 asbestos-related lawsuits. (Id.) As of August 31, 2016, the Debtors were named as defendants in approximately 14,000 asbestos-related bodily injury lawsuits pending in courts across the country. (Id.)

### 4.      Asbestos Personal Injury Insurance and Coverage Litigation.

Truck issued a Comprehensive General Liability policy, renewed annually, that covered the Debtors from January 1, 1965 through April 1, 1983 (collectively, the "Truck Policies"). (McChesney Decl. ¶ 15.)  As a result of over 19 years of litigation,[8] it is now settled that:  (a) Truck must defend each covered Asbestos Personal Injury Claim (without eroding coverage) and indemnify the Debtors for such claims up to the $500,000 per claim limit of the Truck Policy year selected by the Debtors;[9] and (b) the Debtors' excess insurers are obligated under their policies (each an "Excess Policy") to respond to an Asbestos Personal Injury Claim and indemnify the Debtors for amounts in excess of the $500,000 Truck policy limit.  (Id.)  The Excess Policy obligated to respond corresponds to the Truck policy year selected by the Debtors. (Id.)  In addition, there exists certain excess coverage available to pay asbestos claims outside the policy periods of the Truck Policies, and the Plan includes an exhibit list identifying all known available excess insurance policies that provide coverage for asbestos claims.  (Plan Exhibit IV.M.3, List of Asbestos-Only Policies.)

In December 2013, the Debtors and certain of their excess insurers entered into a confidential coverage in place agreement (the "Excess CIP Agreement") with respect to the Debtors' excess coverage.  (Id. ¶ 16.)  The Excess CIP Agreement provides, among other things, that:  (a) the excess insurers that are party to the Excess CIP Agreement will provide coverage for the Asbestos Personal Injury Claims in amounts above Truck's primary policy limit of

---

[8]      Certain issues in asbestos coverage litigation are the subject of an appeal pending in the California Court of Appeal (No. B278091); however, those issues do not address (and will not alter) the fundamental aspects of the Debtors' coverage for Asbestos Personal Injury Claims under the Truck Policies.

[9]      Although the per-occurrence limit and deductibles under the Truck Policies vary, virtually all Asbestos Personal Injury Claims have triggered a policy year with a $5,000 deductible and a $500,000 per claim primary product liability insurance limit. (McChesney Decl. ¶ 15, n.4.)

-8-

$500,000, notwithstanding the insolvencies of certain excess insurers; and (b) the Debtors will pay to the excess insurers some portion of any funds distributed from insolvent asbestos insurers in accordance with a formula set forth in the Excess CIP Agreement.  (Id.)

Although the Debtors successfully established insurance coverage for substantially all of the Asbestos Personal Injury Claims before filing for bankruptcy, they still faced substantial costs and risks associated with asbestos-related lawsuits.  (Id. ¶ 17.)  The Debtors were obligated to pay policy deductibles, owing more than $3 million in deductibles as of the Petition Date, and faced liability for uninsured judgments and claims, including punitive damages.  (Id.)  In at least three prepetition cases, juries awarded punitive damages against the Debtors in amounts ranging from $100,000 to $20,000,000.  (Id.)

### 5.    The Debtors' Environmental Liabilities.

One or both of the Debtors also have alleged environmental liabilities arising from formerly owned and/or operated properties located in St. Helens, Oregon and Seattle, Washington.[10]  (McChesney Decl. ¶ 18.)

Both Debtors owned and operated facilities in the Seattle area during periods between 1929 and 1987.  (Id. ¶ 20.)  HPCI operated a cement plant, and owned and operated a ready-mix cement plant and a bulk cement receiving, storage and distribution facility.  (Id.)  Kaiser Gypsum owned and operated the same cement plant, as well as a gypsum plant and a gypsum accessories facility.  (Id.)  All of these facilities were on or adjacent to the Lower Duwamish Waterway, an industrial waterway near Seattle, Washington.  (Id.)  By 1978, Kaiser Gypsum had sold all of its operations in the Seattle area, and by 1987, HPCI had sold all of its facilities in Seattle.  (Id.)

---

[10]     HPCI never owned or operated the St. Helens plant.  (McChesney Decl. ¶ 18, n.5.)

-9-

In 1956, Kaiser Gypsum acquired a fiberboard manufacturing facility in St. Helens, Oregon that produced ceiling tiles, ceiling panels and related products.  (Id. ¶ 19.)  In 1978, Kaiser Gypsum sold the plant to Owens Corning Fiberglas Corporation ("Owens Corning").  (Id.)  In 1987, the plant was sold to Armstrong World Industries, Inc. ("Armstrong"), which closed the plant in 2018.  (Id.)

A five-mile stretch of the Lower Duwamish Waterway is a United States Environmental Protection Agency (the "EPA") Superfund site (the "Lower Duwamish Superfund Site" and, together with the aforementioned former Seattle area facilities adjacent to the Lower Duwamish Superfund Site and the St. Helens site, the "Two Sites") involving approximately 120 potentially responsible parties ("PRPs"), including the Debtors.  (Id. ¶ 21.)

### 6.    Environmental Insurance.

The Debtors believe that they have liability insurance that provides coverage for their environmental liabilities relating to their formerly owned plants in Seattle and St. Helens. (Id. ¶ 22.)  On September 29, 2016, the Debtors filed suit against their environmental insurers in state court in Oregon seeking coverage for defense and indemnity costs incurred and to be incurred with respect to their environmental liabilities at the Two Sites.  (Id.)

### B.    PREPETITION DISCUSSIONS WITH REPRESENTATIVES OF ASBESTOS CLAIMANTS.

Prior to the Petition Date, an ad hoc committee of asbestos personal injury claimants (the "Ad Hoc Committee") consisting of law firms that have filed Asbestos Personal Injury Claims against the Debtors was formed to engage in discussions with the Debtors regarding the terms of a consensual plan of reorganization.  (First Day Decl. ¶ 46.)  Following its formation, the Ad Hoc Committee retained bankruptcy counsel, insurance counsel, a financial advisor and an asbestos estimation consultant.  (Id.)  The Ad Hoc Committee's work prepetition

included gathering, review and analysis of information regarding the Debtors.  In that regard, the Ad Hoc Committee delivered to the Debtors a series of information requests and, in response thereto, the Debtors provided the Ad Hoc Committee with numerous documents and other information.  (Id.)  Prior to the Petition Date, the Debtors and the Ad Hoc Committee also agreed on the selection of Lawrence Fitzpatrick as the FCR.  (Id.)  Mr. Fitzpatrick retained his own counsel and an estimation consultant.  (Id.)  The Debtors provided the FCR and his professionals with the same information they furnished to the Ad Hoc Committee.  (Id.)

Prepetition meetings and other communications occurred among some or all of the Debtors, Truck, the Ad Hoc Committee and the FCR.  (First Day Decl. ¶ 47.) Communications between the Debtors and certain of the excess carriers also took place.  (Id.) Among other things, the parties discussed the filing of the Reorganization Cases and potential paths forward to a consensual plan.  (Id.)  Although all the parties indicated a desire to reach agreement on a consensual reorganization plan, due to time constraints, the parties were not able to engage in substantive discussions regarding the terms of a plan prior to the Petition Date.  (Id.)

### C.      DEBTORS' DECISION TO FILE THE REORGANIZATION CASES.

The Debtors filed these Reorganization Cases to fairly and permanently resolve their legacy asbestos and environmental liabilities.  (McChesney Decl. ¶ 23.)  Resolving these liabilities in accordance with the Plan will benefit both the Debtors and their creditors by, among other things, (a) eliminating the ongoing costs, administrative burdens, risks and distractions that the Debtors have been subjected to from these decades-old liabilities, and (b) providing for (i) the  liquidation in the tort system and the payment of current and future Asbestos Personal Injury Claims from the Asbestos Personal Injury Trust and the Debtors' asbestos insurers and (ii) the payment in full on the Plan's Effective Date of all Allowed General Unsecured Claims, including Allowed Environmental Claims.  (Id.)

-11-

**D.     APPOINTMENT OF THE CREDITORS' COMMITTEE, THE ASBESTOS PERSONAL INJURY COMMITTEE AND FUTURE CLAIMANTS' REPRESENTATIVE.**

On October 14, 2016, the Bankruptcy Court entered an order appointing the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  [D.I. 84].  On August 30, 2019, the Creditors' Committee filed a motion [D.I. 1771] indicating that members Owens Corning and Armstrong were retiring from the committee and requesting Ash Grove Cement Company ("Ash Grove") be substituted as a member of the committee for such retiring members. On October 17, 2019, the Bankruptcy Court entered an order [D.I. 1864] granting the Creditors' Committee's motion.  On October 19, 2016, the Bankruptcy Court entered an order appointing the ACC pursuant to section 1102 of the Bankruptcy Code.  [D.I. 100]  With the assistance of counsel and other advisers, the ACC has been active in all aspects of the Debtors' cases, including numerous investigations and ultimately the negotiation of the Term Sheet leading to the Plan.

In addition, by order dated October 19, 2016 [D.I. 99], the Bankruptcy Court approved the appointment of Lawrence Fitzpatrick as the FCR.  Mr. Fitzpatrick has extensive experience with the resolution of asbestos-related personal injury claims and asbestos bankruptcy cases.  (Fitzpatrick Decl. ¶¶ 4-10.)  With the assistance of counsel and other advisors, Mr. Fitzpatrick has been involved in all aspects of the Debtors' Reorganization Cases.

**E.     RESOLUTION OF THE REORGANIZATION CASES.**

**1.     Settlement Regarding Asbestos Personal Injury Claims.**

On October 20, 2017, the Debtors and Lehigh Hanson reached an agreement in principle with the ACC and the FCR on the treatment of present and future Asbestos Personal Injury Claims.  (McChesney Decl. ¶ 26.)  The Plan implements that settlement by, among other things, providing for the creation and funding of the Asbestos Personal Injury Trust to resolve

-12-

Asbestos Personal Injury Claims pursuant to section 524(g) of the Bankruptcy Code.  (Id.)  The

Asbestos Personal Injury Trust to be created under the Plan will be funded with a $49 million

cash payment by the Debtors or Lehigh Hanson, a $1 million Payment Note, the first $12 million

of net recovery on Phase 1 Claims, if any (after the Asbestos Personal Injury Trust Appellate

Costs have been deducted) and the assignment of the Debtors' rights under insurance policies

covering Asbestos Personal Injury Claims.  (Id.; Fitzpatrick Decl. ¶ 16.)  The Plan provides that,

with respect to the Debtors' Insured Asbestos Claims, the insurer's defense rights will be

preserved and asbestos claimants will be permitted to continue to assert actions against the

Reorganized Debtors in name only in the tort system to collect available insurance.  (Plan

§§ III.B.4., IV.L, IV.Q.)  The Asbestos Personal Injury Trust will fairly and equitably satisfy the

Asbestos Personal Injury Claims in accordance with the Asbestos Personal Injury Trust

Distribution Procedures, described below.

### 2. Settlements Regarding Environmental Claims.

The Debtors successfully negotiated settlement agreements with the Oregon

Department of Environmental Quality (the "DEQ") regarding the St. Helens site and the United

States regarding the Lower Duwamish Superfund Site.  (McChesney Decl. ¶ 29.)  The Debtors

also reached settlement agreements with other environmental creditors, multiple insurers and

several co-PRPs regarding the Two Sites.  (Id.)

In particular, the Debtors have negotiated and the Bankruptcy Court has approved

settlements with (a) Armstrong [D.I. 1556], pursuant to which Armstrong withdrew its proofs of

Claim with respect to the St. Helens site and paid the Debtors $1 million; (b) Owens Corning

[D.I. 1558], pursuant to which Owens Corning's proofs of Claim were deemed withdrawn and

Owens Corning was deemed to waive and release any Claims against the Debtors related to the

St. Helens site; (c) the DEQ [D.I. 1625], pursuant to which the Debtors agreed to pay in full an

-13-

Allowed General Unsecured Claim in the amount of $67 million; (d) the City of Seattle

(the "City") [D.I. 1602], pursuant to which the City will have an Allowed General Unsecured

Claim in the amount of $80,951.87 against each of the Debtors; (e) the Port of Seattle

(the "Port") [D.I. 1603], pursuant to which the Port will have an Allowed General Unsecured

Claim in the amount of $81,815.22 against each of the Debtors; (f) King County, Washington

(the "County") [D.I. 1604], pursuant to which the County will have an Allowed General

Unsecured Claim in the amount of $85,255.87 against each of the Debtors; (g) The Boeing

Company ("Boeing") [D.I. 1601], pursuant to which Boeing will have an Allowed General

Unsecured Claim in the amount of $137,500.00 against each of the Debtors; and (h) Ash Grove

[D.I. 1908], pursuant to which Ash Grove will have an Allowed General Unsecured Claim in the

amount of $8,618.42 against each of the Debtors.  (McChesney Decl. ¶ 30.)

In addition, the Bankruptcy Court entered an order [D.I. 1789] approving the

Debtors' settlement with the United States, on behalf of the EPA and the United States

Department of Interior, acting through the U.S. Fish and Wildlife Service (the "DOI"), and the

United States Department of Commerce, acting through the National Oceanic and Atmospheric

Administration (the "NOAA"), pursuant to which the Debtors agreed to the allowance and

payment in full of the following general unsecured claims:  (a) Proof of Claim No. 10 (EPA) in

the amount of $1,300,000 against Kaiser Gypsum; (b) Proof of Claim No. 11 (EPA) in the

amount of $1,300,000 against HPCI; (c) Proof of Claim No. 9 (NOAA) in the amount of

$200,000 against Kaiser Gypsum; (d) Proof of Claim No. 6 (NOAA) in the amount of $200,000

against HPCI; (e) Proof of Claim No. 7 (DOI) in the amount of $200,000 against Kaiser

Gypsum; and (f) Proof of Claim No. 8 (DOI) in the amount of $200,000 against HPCI.  (Id.

¶ 31.)  The Debtors' agreement with the United States also resolved the following claims filed by

-14-

Ash Grove on behalf of the United States:  (a) Proof of Claim No. 648 (EPA) in the amount of

$325,000 against Kaiser Gypsum; (b) Proof of Claim No. 653 (EPA) in the amount of $325,000

against HPCI; (c) Proof of Claim No. 651 (NOAA) in the amount of $50,000 against Kaiser

Gypsum; (d) Proof of Claim No. 650 (NOAA) in the amount of $50,000 against HPCI; (e) Proof

of Claim No. 649 (DOI) in the amount of $50,000 against Kaiser Gypsum; and (f) Proof of

Claim No. 652 (DOI) in the amount of $50,000 against HPCI.  (Id.)

Under applicable law and in accordance with the terms of the settlements with the

DEQ and the United States, the Debtors received contribution protection with respect to the

matters addressed in each settlement concerning the Two Sites.  (McChesney Decl. ¶ 32.)

The Debtors also reached settlement agreements with the following insurers to

resolve disputes with respect to environmental insurance coverage, which have been approved by

the Bankruptcy Court (the "Environmental Insurance Settlements"):  (a) London Market Insurers

and Continental Insurance Company, Columbia Casualty Company, and National Fire Insurance

Company of Hartford; (b) Insurance Company of the State of Pennsylvania and National Union

Fire Insurance Company of Pittsburgh, PA; (c) Truck; (d) Westchester Fire Insurance Company

and Westchester Surplus Lines Insurance Company; (e) Hartford Fire Insurance Company, First

State Insurance Company, New England Insurance Company and Twin City Fire Insurance

Company; (f) Munich Reinsurance America, Inc. and Executive Risk Indemnity, Inc.;

(g) Transport Insurance Company, as successor in interest to Transport Indemnity Company;

(h) Allstate Insurance Company, as successor in interest to Northbrook Excess and Surplus

Insurance Company f/k/a Northbrook Insurance Company; (i) Westport Insurance Corporation,

formerly known as Employers Reinsurance Corporation; and (j) Allianz Underwriters Insurance

Company and Fireman's Fund Insurance Company.  (McChesney Decl. ¶ 33.)  In addition, the

Debtors negotiated a further settlement agreement with Associated International Insurance Company and Transamerica Premier Ins. Co. and TIG Insurance Company [D.I. 2136], which has been approved by the Bankruptcy Court.  (Id.)  Pursuant to these settlements, the insurers will pay the Debtors a total of approximately $50.8 million to buy back certain of the Debtors' rights to environmental insurance coverage free and clear of all liens, claims, encumbrances and interests.  (Id.)  These settlements will not affect coverage for Asbestos Personal Injury Claims. (Id.)

### 3.       Settlement with Lehigh Hanson.

Finally, the Debtors reached an agreement with Lehigh Hanson, pursuant to which Lehigh Hanson has agreed to contribute up to $28.15 million, minus the amount of the Insolvent Insurers Proceeds to which the Debtors are determined to be entitled, for the payment of Allowed General Unsecured Claims under the Plan.  (Id. ¶ 34; Plan § IV.E.)

### 4.       Sufficient Funds to Pay All Allowed General Unsecured Claims.

As a result of all the agreements described above, the Debtors will have sufficient funds to pay all Allowed General Unsecured Claims in full.  (Bittner Decl. ¶ 24; McChesney Decl. ¶ 35.)  The Debtors estimate that the aggregate amount of Allowed General Unsecured Claims is approximately $72,569,631.[11]  (Bittner Decl. ¶ 22; McChesney Decl. ¶ 35.)  As a result of the Environmental Insurance Settlements and the agreement with Lehigh Hanson, the Debtors will have available funds sufficient to pay that amount.  (Bittner Decl. ¶ 24; McChesney Decl. ¶ 35.)

---

[11]    This figure does not include any amounts with respect to the currently disputed Claims held by Glacier Northwest, Inc. but includes an amount of $465,140.83 to reflect the amount at which the disputed Truck Claim was resolved by the Bankruptcy Court in advance of the Confirmation Hearing.

**F.      MODIFICATIONS TO THE PLAN.**

The Modifications to the Plan do not materially or adversely affect or change the treatment of any Claim against or Interest in any Debtor and fully comply with all applicable provisions of the Bankruptcy Code and Rules.

**G.      COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.**

**1.      Section 1129(a)(1) — Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

The Plan complies with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(l) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code.

**a.      Sections 1122 and 1123(a)(1)-(4) — Classification and Treatment of Claims and Interests.**

i.      The Plan, which constitutes a separate plan of reorganization for each of the Debtors, meets the classification requirements of sections 1122(a) and 1123(a)(1)-(4) of the Bankruptcy Code.  Article II of the Plan classifies Claims and Interests into seven separate categories.  (Plan art. II.)  In particular, Article II of the Plan segregates into separate Classes Priority Claims (Class 1), Secured Claims (Class 2), General Unsecured Claims (Class 3), Asbestos Personal Injury Claims (Class 4), Surety Bond Claims (Class 5), Intercompany Claims (Class 6) and Stock Interests (Class 7).  The number of Classes reflects the diverse characteristics of those Claims and Interests, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within that Class.  (McChesney Decl. ¶ 37.)

ii.      In accordance with section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan identifies and describes each Class of Claims or Interests that is not

-17-

impaired under the Plan.  In particular, Article III of the Plan indicates that Classes 1-3 and 5-7 are unimpaired.  (Plan art. III.)

> iii.     In accordance with section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan identifies and describes each Class of Claims or Interests that is impaired under the Plan.  In particular, section III.B.4 of the Plan states that Class 4 (Asbestos Personal Injury Claims) are impaired and provides for the treatment of that class.  (Plan § III.B.4.)

> iv.     In accordance with section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim or Interest of a particular Class unless the holder of such a Claim or Interest agrees to less favorable treatment.  (Plan art. III.)

> **b.     Section 1123(a)(5) — Adequate Means for Implementation of the Plan.**

In accordance with the requirements of section 1123(a)(5) of the Bankruptcy Code, Article IV and various other provisions of the Plan provide adequate means for the Plan's implementation.  Specifically, the Plan provides for:  (a) except as otherwise provided in the Plan and subject to the Restructuring Transactions, the Debtors' continued corporate existence and the vesting of all property of the respective Estates of the Debtors and any property acquired by a Debtor or Reorganized Debtor under the Plan in the appropriate Reorganized Debtor under section IV.A of the Plan; (b) the consummation of the Restructuring Transactions under section IV.B of the Plan; (c) certain real estate and lease transactions under section IV.C of the Plan; (d) the adoption of the corporate constituent documents that will govern the Reorganized Debtors and the identification of the initial boards of directors of the Reorganized Debtors under section IV.D of the Plan; (e) sufficient cash resources to make all plan distributions pursuant to section IV.E of the Plan; (f) the creation of, and transfer of certain assets to, the Asbestos Personal Injury

-18-

Trust under section IV.F of the Plan; (g) the appointment of the Asbestos Personal Injury Trustee

under section IV.H of the Plan; (h) the funding of the Asbestos Personal Injury Trust under

section IV.K.2 of the Plan; (i) the transfer of and preservation of rights of action by the

Reorganized Debtors, and the release of certain rights of action against the Debtors, under

section IV.R of the Plan; (k) the release of all mortgages, deeds of trust, liens or other security

interests against the property of the Estate under section IV.S of the Plan; (l) the authorization to

execute various documents and to enter into various transactions to effectuate the Plan and the

exemption from certain transfer taxes under section IV.T of the Plan; and (m) the direction to

comply with QSF Regulations under section IV.V of the Plan.  Accordingly, the Plan fully

complies with the requirements of section 1123(a)(5) of the Bankruptcy Code.

        c.      **Section 1123(a)(6) — Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.**

The Plan provides that the certificates of incorporation of each Reorganized

Debtor will prohibit the issuance of nonvoting equity securities to the extent required under

section 1123(a) of the Bankruptcy Code.  (Plan § IV.D.1.)  Accordingly, the Plan fully complies

with the requirements of section 1123(a)(6) of the Bankruptcy Code.

        d.      **Section 1123(a)(7) — Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.**

The Plan complies with section 1123(a)(7) of the Bankruptcy Code and ensures

that the selection of the officers and directors of each of the Reorganized Debtors is consistent

with the interests of creditors and equity security holders and with public policy.  Under section

IV.D.2 of the Plan, the initial boards of directors of each of the Reorganized Debtors will consist

of the directors and officers of each Debtor immediately prior to the Effective Date.  (Plan

§ IV.D.2.)  Further, this section of the Plan provides that directors and officers will serve from

-19-

and after the Effective Date until a successor is duly elected or appointed and qualified or until

their earlier death, resignation or removal in accordance with the terms of the certificates of

incorporation and by-laws or similar constituent documents of the applicable Reorganized

Debtor and applicable state law.  (Id.)  The Plan's provisions with respect to the selection of

directors and officers are consistent with the interests of creditors and public policy.

> **e.        Section 1123(b) — Discretionary Provisions.**

Section 1123(b) of the Bankruptcy Code identifies various discretionary

provisions that may be included in a plan of reorganization, but are not required.  For example, a

plan may impair or leave unimpaired any class of claims or interests and provide for the

assumption or rejection of executory contracts and unexpired leases.  11 U.S.C. § 1123(b)(l)-(2).

A plan also may provide for:  (a) "the settlement or adjustment of any claim or interest belonging

to the debtor or to the estate;" (b) "the retention and enforcement by the debtor, by the trustee, or

by a representative of the estate appointed for such purpose, of any such claim or interest,"

11 U.S.C. § 1123(b)(3)(A)-(B); or (c) "the sale of all or substantially all of the property of the

estate, and the distribution of the proceeds of such sale among holders of claims or interests."

11 U.S.C. § 1123(b)(4).  Finally, a plan may "modify the rights of holders of secured claims . . .

or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims" and may

"include any other appropriate provision not inconsistent with the applicable provisions of

[title 11]."  11 U.S.C. § 1123(b)(5)-(6).

As described above, the Plan provides for the impairment of Class 4, while

leaving all other Classes of Claims and Interests unimpaired.  The Plan thus modifies the rights

of the holders of certain Claims and leaves the rights of others unaffected.  (Plan art. IV.)  In

particular, Asbestos Personal Injury Claims will be channeled to the Asbestos Personal Injury

Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related

Asbestos Personal Injury Trust Distribution Procedures.  (Plan § III.B.4.)  The Plan also provides for (a) the assumption, assumption and assignment or rejection of executory contracts and unexpired leases to which the Debtors are parties (Plan art. V) and (b) the retention and enforcement of certain claims by the Debtors (Plan § IV.R).

Finally, in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes numerous other provisions necessary for its implementation that are consistent with the Bankruptcy Code, including:  (a) Article IV of the Plan providing for (i) the creation of the Asbestos Personal Injury Trust and (ii) the appointment of the Asbestos Personal Injury Trustee; (b) Article VI of the Plan governing Distributions on account of Allowed Claims; (c) Article VII of the Plan establishing procedures for resolving Disputed Claims and making Distributions on account of such Disputed Claims once resolved; (d) Article IX of the Plan regarding the discharge of Claims and injunctions against certain actions; and (e) Article X of the Plan regarding retention of jurisdiction by the Bankruptcy Court over certain matters after the Effective Date.  Accordingly, the Plan fully complies with section 1123(b) of the Bankruptcy Code.

### f.        Section 1123(d) — Cure of Defaults.

The Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(l) of the Bankruptcy Code.  (Plan § V.B.)  Additionally, in accordance with Article III of the Plan, certain Claims may be Reinstated.  All Cure Amount Claims and Reinstated Claims will be determined in accordance with the underlying agreements and applicable non-bankruptcy law, and pursuant to the procedures established in the Plan or, to extent applicable, any separate orders of the Bankruptcy Court.  (Plan §§ III.B, V.B.)

Accordingly, the Plan fully complies with the requirements of section 1123(d) of the Bankruptcy Code.

### 2. Section 1129(a)(2) — Compliance with Applicable Provisions of the Bankruptcy Code.

The Debtors have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  The Disclosure Statement and the procedures by which the ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement Order.  Votes with respect to the Plan were solicited in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order.  The Debtors, the Reorganized Debtors, Lehigh Hanson, the ACC and the FCR, their respective members and each of their respective directors, officers, employees, agents and professionals, acting in such capacity, have acted in "good faith," within the meaning of section 1125(e) of the Bankruptcy Code.

### 3. Section 1129(a)(3) — Proposal of the Plan in Good Faith.

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  A plan is considered proposed in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."  Hanson v. First Bank of S.D., 828 F.2d 1310, 1315 (8th Cir. 1987); see also In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (the good faith standard in section 1129(a)(3) requires that there must be "'some relation'" between the chapter 11 plan and the "reorganization-related

purposes" that chapter 11 was designed to serve); In re Zenith Elecs. Corp., 241 B.R. 92, 107

(Bankr. D. Del. 1999) ("The good faith standard requires that the plan be proposed with honesty,

good intentions and a basis for expecting that a reorganization can be effected with results

consistent with the objectives and purposes of the Bankruptcy Code." (quotation marks

omitted)); In re New Valley Corp., 168 B.R. 73, 80 (Bankr. D.N.J. 1994) ("It is generally held

that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a

result consistent with the objectives and purpose of the Bankruptcy Code.").  The requirement of

good faith must be viewed in light of the totality of the circumstances surrounding the

formulation of a chapter 11 plan.  See McCormick v. Bane One Leasing Corp. (In re

McCormick), 49 F.3d 1524, 1526 (11th Cir. 1995) ("The focus of a court's inquiry is the plan

itself, and courts must look to the totality of the circumstances surrounding the plan…keeping in

mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a

fresh start.").

In determining whether the plan will succeed and accomplish goals consistent

with the Bankruptcy Code, courts look to the terms of the reorganization plan itself.  See In re

Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (concluding that the good faith test

provides the court with significant flexibility and is focused on an examination of the plan itself,

rather than other, external factors), aff'd in part, remanded in part on other grounds, 103 B.R. 521

(D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990).  The plan proponent must show, therefore, that

the plan has not been proposed by any means forbidden by law and that the plan has a reasonable

likelihood of success.  See In re Century Glove, Inc., Civ. A. Nos. 90-400-SLR, 90-401-SLR,

1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ("A court may only confirm a plan for

reorganization if…the 'plan has been proposed in good faith and not by any means forbidden by

law….'  Moreover, 'where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied[.]'"); see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997) (same).  Whether a plan has been proposed in good faith turns on whether it "'will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  In re Am. Capital Equip., LLC, 688 F.3d 145, 156 (3d Cir. 2012).

The Plan serves valid bankruptcy objectives—it is the product of extensive arms'-length negotiations among the ACC, the FCR, the Debtors and numerous other parties, reflects a consensual resolution of the Debtors' asbestos and environmental liabilities and maximizes the value of assets available to satisfy claims.  In re Michener, 342 B.R. 428, 434 (Bankr. D. Del. 2006); Am. Capital Equip., LLC, 688 F.3d at 156 (explaining that the two "'recognized' policies, or objectives, [of Chapter 11] are 'preserving going concerns and maximizing property available to satisfy creditors'").  That the Plan maximizes the value of assets is demonstrated by the fact that creditor recoveries are greater than could be realized if the Debtors were to liquidate.  (Bittner Decl. ¶ 20; Liquidation Analysis.[12])

To arrive at this juncture, the Debtors actively involved their creditor constituencies in the Plan-formulation process.  (McChesney Decl. ¶ 39.)  The Debtors provided substantial information to all constituencies and, thereafter, reached numerous settlements that will be implemented through the Plan.  (Id.)  As described above and in the Disclosure Statement and the McChesney Declaration, the Debtors engaged in arms'-length negotiations with many

---

[12]    The Liquidation Analysis is attached as Exhibit IV to the Disclosure Statement and was admitted into the record at the Confirmation Hearing.  [Conf. Exhibit 22-B.]

-24-

parties in interest over the course of these cases and the Plan reflects agreements among the Debtors, Lehigh Hanson, the ACC, the FCR, the EPA, the DEQ and the Debtors' insurers and other constituents. (Id.) The Debtors' good faith in proposing the Plan is evidenced by these negotiations and agreement and further by the unanimous support of the holders of Class 4 Claims, the only Class entitled to vote on the Plan. See Voting Agent Declaration; see also Eagle-Picher, 203 B.R. at 274 (finding that a plan of reorganization was proposed in good faith when, among other things, it was based on extensive arms'-length negotiations among the plan proponents and other parties in interest). Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code have been fully satisfied.

Truck made a number of arguments that the Plan was not proposed in good faith. For the reasons set forth below, Truck lacks standing to make these arguments, but even if Truck had standing, the arguments would fail.

Contrary to Truck's contention, the Plan does not violate the spirit and purpose of section 524(g). The Court finds no requirement that all of a debtor's asbestos liabilities must be resolved by a section 524(g) trust, as opposed to being resolved in the tort system. Here, moreover, the Debtors have effectively unlimited insurance. Under these circumstances, the fact that the Trust resolves only uninsured claims is not contrary to section 524(g).

Truck argued that the Plan represented a collusive and improper agreement to send claims back to the tort system. The argument that resolving asbestos cases in the tort system is unfair or constitutes bad faith is rejected. Bankruptcy courts routinely grant relief from the automatic stay to allow claimants and creditors to pursue insurance in state court.[13] In its

---

[13] Bankr. Hr'g Tr. (8/13/2020) 29:11-19. Moreover, other Section 524(g) plans of reorganization have been approved that provided for tort claims to be sent back to the tort system. See, e.g., In re Thorpe Insulation Co., Case No. 07-19271(BB) (Bankr. C.D. Cal. May 8, 2013) (providing that asbestos claimants can

argument, Truck relied heavily on Judge Hodges' findings in Garlock. This Court is concerned

for the same reasons that the bankruptcy court was concerned in Garlock, but this Court does not

read Garlock as an indictment of the tort system or a ruling that a party cannot get a fair trial in

state and federal courts. Truck's arguments also hinged on speculation as to future events, such

as what would happen in state courts, and are unsupported. This Court is not inclined to indict

its colleagues on the state benches, nor does the Court believe that a bankruptcy court in North

Carolina is necessary to protect state courts from fraud. The findings in Garlock have been

widely debated, and indeed some state legislatures have taken steps to address these issues. State

courts and litigants will obviously be alert to what has been proposed in this case and can take

their own actions.

Bankruptcy is not intended to relieve insurers of their contractual liabilities, or to

improve their position under their insurance contracts in the tort system.[14] It is not within the

province of this Court to mandate to state courts and other federal courts what kind of discovery

is required in asbestos cases. The remedy Truck seeks—a requirement that before an asbestos

claimant can sue in state court they must provide pre-suit discovery that is not mandated in other

forums and not for the benefit of the Asbestos Personal Injury Trust—is essentially legislative in

---

commence actions in the tort system consistent with the other provisions of the plan and distribution
procedures); In re Plant Insulation Co., 485 B.R. 203, 213 (N.D. Cal. 2012), rev'd on other grounds,
734 F.3d 900 (9th Cir. 2013), and aff'd, 544 F. App'x 669 (9th Cir. 2013) ("Alternatively, under the Plan,
asbestos injury claimants retain their right to pursue Plant and Non–Settling Insurers by filing a tort action,
subject to several conditions."); In re Burns & Roe Enters., Inc., Nos. 00-41610, 05-47946 (RG) 2009 WL
438694, at *4 (D.N.J. Feb. 23, 2009) ("The Trust may authorize individual claimants, whose claims are
potentially covered by policies issued by CNA, to commence litigation in the tort system."); see also In re
Sound Shore Med. Ctr., Case No. 13-22840 (Bankr. S.D.N.Y. Oct. 2, 2013), ECF No. 367 (permitting
claims to return to tort system); In re UTGR, Inc. d/b/a Twin River, Case No. 09-12418 (Bankr. R.I. Mar.
19, 2010), ECF No. 610 (same).

14     Further, the Truck Policies expressly state that the Debtors' bankruptcy does not relieve Truck of its
obligations under the Truck Policies. Conf. Exhibit 30, 1974 Truck Policy at TRK0000587 ("Bankruptcy
or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations
hereunder.").

-26-

nature, and is inappropriate.  The Court hereby rejects this burdensome and unprecedented attempt to impair the rights of asbestos claimants to pursue their claims in the tort system.

Finally, the Court rejects Truck's argument it was unfairly denied an opportunity to negotiate with the parties both pre and post-petition.  While the preference in bankruptcy is for parties to negotiate, there is no requirement that a plan satisfy the desires of an insurer. Furthermore, the evidence establishes that no substantive Plan negotiations occurred prepetition. Thus, Truck was not excluded.  (First Day Decl. ¶ 47.)  Postpetition, all parties were free to negotiate, but Truck did not.  Hr'g Tr. (7/20/2020) at 153:18-154:8.  Truck attempted to negotiate only after the Plan Proponents had already reached an agreement in the form of the Term Sheet. Id. at 154:2-8.  The Debtors, the ACC, the FCR and Truck then participated in mediation to determine whether there was a resolution that could be reached that would involve Truck.  Id. at 154:9-18.  It is not surprising that Truck found it difficult to negotiate with the parties to reduce its unlimited obligations under the Truck Policies to a fixed or otherwise limited amount. That is certainly no basis for an objection.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code have been fully satisfied.

### 4. Section 1129(a)(4) — Court Approval of Certain Payments as Reasonable.

In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which parties may be entitled in connection with the Reorganization Cases, including Professionals' Fee Claims, are subject to the approval of the Bankruptcy Court.  (Plan § III.A.1.)  Although the Bankruptcy Court has authorized the interim payment of the fees and expenses incurred by Professionals in connection with the Reorganization Cases, all such fees and expenses remain subject to final review for reasonableness by the Bankruptcy Court.  (Id.)  Finally, the Plan provides that the Bankruptcy Court will retain jurisdiction after the Effective Date to hear and

determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.  (Plan art. X.)  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**5.      Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.**

The Debtors have disclosed all information required by section 1129(a)(5) of the Bankruptcy Code, including the names of the Reorganized Debtors' officers and directors. (Disclosure Statement § III.A.2; Plan § IV.D.2.)  The appointment of the proposed directors and officers, each of who is highly qualified and experienced, is consistent with the interests of the holders of Claims and Interests and with public policy.

**6.      Section 1129(a)(6) — Approval of Rate Changes.**

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after Confirmation.  (McChesney Decl. ¶ 42.)

**7.      Section 1129(a)(7) — Best Interests of Holders of Claims and Interests.**

Each holder of a Claim in the sole impaired Class (Class 4) has accepted the Plan or, as demonstrated by the Liquidation Analysis, will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  (Bittner Decl. ¶ 12; Liquidation Analysis.)  Thus, the Plan satisfies the requirement of section 1129(a)(7)(A) of the Bankruptcy Code.

**8.      Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class.**

Pursuant to section 1129(a)(8) of the Bankruptcy Code, all classes of Claims and Interests have either accepted the Plan or are unimpaired.  (Voting Agent Decl. ¶ 10.) Specifically, Class 4, the only class entitled to vote on the Plan, unanimously voted in favor of the Plan.  (Id.)  Classes 1-3 and 5-6 are unimpaired under the Plan and, therefore, are deemed to have accepted the Plan.  (Plan § III.B; Disclosure Statement Order ¶ II.B.)  Accordingly, the Debtors have satisfied section 1129(a)(8) of the Bankruptcy Code.

**9.      Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

The Plan also meets the requirements regarding the payment of Administrative Claims, Priority Claims and Priority Tax Claims, as set forth in section 1129(a)(9) of the Bankruptcy Code.

Section III.A.1 of the Plan provides that, subject to certain bar dates and unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed amount of such Administrative Claim either:  (a) as soon as practicable after the Effective Date; or (b) if the Administrative Claim is not allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes allowed by a Final Order or a Stipulation of Amount and Nature of Claim.  In addition, Administrative Claims based on ordinary course liabilities shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holder of such Administrative Claims or further approval of the Bankruptcy Court.

Further, Section III.B.l of the Plan provides that Priority Claims against any Debtor (which include Claims entitled to priority other than Administrative Claims and Priority Tax Claims) will be paid on the Effective Date in an amount equal to the Allowed Claim. Section III.A.2 of the Plan provides that, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, on the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim, each Allowed Priority Tax Claim will receive payment in full of the allowed amount of the Priority Tax Claim.

**10.     Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class.**

As shown in the Voting Agent Declaration and as reflected in the record of the Confirmation Hearing, at least one Class of Claims that is impaired under the Plan has voted to accept the Plan, determined without including the acceptance by any insider, with respect to all Reorganized Debtors under the Plan.  (Voting Agent Decl. ¶ 10.)  Specifically, Class 4 Claims (Asbestos Personal Injury Claims), which is not an insider Class and is the only impaired Class under the Plan, has voted unanimously to accept the Plan.  (Id.)

**11.     Section 1129(a)(11) — Feasibility of the Plan.**

On or about the Effective Date, non-debtor Lehigh Cement Company LLC will transfer its interest in the Real Properties located in Kosse, Limestone County, Texas and Kunkletown, Monroe County, Pennsylvania, together with its rights under certain leases with a third party related to the Real Properties, to Kaiser Gypsum.  (Plan § IV.C; Bittner Decl. ¶ 30; McChesney Decl. ¶ 11.)  The leases are expected to generate net cash flow for Kaiser Gypsum of approximately $68,000 in 2020 and $93,000 in 2021, as demonstrated in the projections attached Exhibit III to the Disclosure Statement and admitted into evidence at the Confirmation Hearing [Conf. Exhibit 22-A] (the "Plan Projections").  (Plan Projections; Bittner Decl. ¶ 30.)  HPCI will

-30-

continue to own its non-Debtor operating subsidiaries (Hanson Micronesia Cement, Inc. and

Hanson Permanente Cement of Guam, Inc.), and the Permanente Property.  (Bittner Decl. ¶ 30.)

HPCI is expected to generate net cash flows from the Permanente Property and the operating

subsidiaries of approximately $6.5 million and $2.6 million in 2020 and 2021, respectively.

(Plan Projections; Bittner Decl. ¶ 30.)

The Reorganized Debtors will have the ability to fund their ongoing operations

from cash flow generated by the businesses they directly or indirectly own.  (Bittner Decl. ¶ 30;

Plan Projections.)  Kaiser Gypsum's lease arrangements for the Real Properties will ensure that it

will generate positive cash flow into the future.  (Id.)  HPCI's Permanente Plant lease

arrangement with non-debtor Lehigh Southwest, coupled with cash flow from its non-debtor

subsidiaries, similarly shows that HPCI will generate positive cash flow into the future.  (Id.)

Additionally, each of the Debtors is ultimately owned by Lehigh Hanson, which has the financial

wherewithal to provide any additional funding needed by either entity.  (Bittner Decl. ¶ 32.)

Finally, the Debtors have sufficient cash and access to financing, in combination with (a) Lehigh

Hanson's cash and access to financing and (b) the proceeds of insurance, to fund the obligations

imposed by the Plan.  (Id. ¶ 34.)

Overall, (a) the Plan provides a feasible means of completing a reorganization of

the Reorganized Debtors' businesses, and (b) there is a more than reasonable assurance that the

Reorganized Debtors will be able to satisfy all of their obligations under the Plan.  (Id. ¶ 33.)

Accordingly, the Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy

Code.

**12.      Section 1129(a)(12) — Payment of Bankruptcy Fees.**

The Plan complies with section 1129(a)(12) by providing that all fees payable

pursuant to 28 U.S.C. § 1930 will be paid in cash on or before the Effective Date.

(Plan § III.A.l.b.)

**13.      Section 1129(a)(13) — Retiree Benefits.**

Section 1129(a)(13) of the Bankruptcy Code is not applicable because the Debtors

do not maintain any retiree benefits, as defined in section 1114 of the Bankruptcy Code.

(McChesney Decl. ¶ 42.)

**14.      Section 1129(d) — Purpose of Plan.**

The principal purpose of the Plan is not avoidance of taxes or avoidance of the

requirements of section 5 of the Securities Act of 1933.  (Id. ¶ 40.)

**H.      THE ASBESTOS PERSONAL INJURY TRUST AND THE ASBESTOS PERMANENT CHANNELING INJUNCTION COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE.**

The Plan comports with the Bankruptcy Code's requirements for issuance of an

injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in

respect of asbestos-related claims or demands against the Reorganized Debtors.

**1.      The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code.**

a.      ***Section 524(g)(2)(B)(i)(I)*** requires that an asbestos trust assume

the liabilities of a debtor that, as of the petition date, has been named as a defendant in actions to

recover damages for asbestos-related claims.  11 U.S.C. § 524(g)(2)(B)(i)(I).  The Plan satisfies

this requirement by its express terms, which state that "the Asbestos Personal Injury Trust shall

assume liability and responsibility, financial and otherwise, for all Asbestos Personal Injury

Claims."  (Plan § IV.K.3.)  By assuming the Debtors' asbestos liability, the Asbestos Personal

-32-

Injury Trust will be responsible for resolving Uninsured Asbestos Claims and the portion of

Insured Asbestos Claims that is not covered by an Asbestos Insurance Policy.  (See Plan § IV.O.;

Asbestos Personal Injury Trust Distribution Procedures §§ 2.2, 5.2, 5.3.)

        b.        ***Section 524(g)(2)(B)(i)(II)*** requires that the trust "be funded in

whole or in part by the securities of 1 or more debtors involved in such plan and by the

obligation of such debtor or debtors to make future payments, including dividends."  11 U.S.C.

§ 524(g)(2)(B)(i)(II).  The Plan satisfies this requirement by providing that the Asbestos Personal

Injury Trust will be funded in part by the Payment Note.  (Plan § IV.K.2.b.)  Pursuant to section

101(49) of the Bankruptcy Code, a "security" includes, among other things, a note.  11 U.S.C.

§ 101(49).  The Payment Note requires the Reorganized Debtors to make a payment of

$1 million on or before the fifth anniversary of the Effective Date.  This obligation is secured by

the Pledge of 100% of the equity of each Reorganized Debtor.  (Plan § I.A.104.)  Accordingly,

the issuance of the Payment Note, of which both Debtors are co-obligors, nominally satisfies

section 524(g)(2)(B)(i)(II)'s requirement that the trust be funded "in part by the securities of 1 or

more debtors and by the obligation of such debtor or debtors to make future payments, including

dividends."[15]

---

[15]    There is an argument that the note is pretextual, given its short term and small amount. See In re
Congoleum Corp., 362 B.R. 167, 177 (Bankr. D.N.J. 2007). However, other courts have confirmed such
plans, particularly, where, as here, the note is only a minor part of the funding to pay claims and/or where
none of the affected parties object . See In re W. Asbestos Co., 313 B.R. 832, 851 (Bankr. N.D. Cal. 2003)
(in the context of a plan in which an insurer was contributing approximately $740 million in cash to the
asbestos trust, noting that "the Plan also provides that MacArthur will contribute to the Trust a promissory
note for $500,000, payable over five years… [and] requires MacArthur to make payments to the Trust
pursuant to the note" and concluding that the note and payment pursuant thereto "are sufficient to satisfy 11
U.S.C. § 524(g)(2)(B)(i)(II)."); In re J T Thorpe Co., 308 B.R. 782, 788-89 (Bankr. S.D. Tex. 2003)
(finding that the "[p]lan complies with Section 524(g)(2)(B)(i)" when trust is "to be funded in part by a
Promissory Note for $2.3 million" and "in part by proceeds received pursuant to the terms of the Asbestos
Insurance Action Recoveries, the Asbestos In-Place Insurance Coverage, the Asbestos Insurance Settlement
Agreements, and by the Asbestos Insurance Policies"); In re Leslie Controls, Inc., Case No. 10-12199
(CSS) (Bankr. D. Del. Jan. 10, 2011), Second Conformed First Amended Plan of Reorganization of Leslie
Controls, Inc. §§ 1.93, 1.94, 9.3(h), (i) (in the context of a trust funded with, among other things, $74

-33-

To the extent section 524(g)(2)(B)(i)(II) may contain a "ongoing business" requirement, the Plan satisfies it.  Here, both Debtors have ongoing business operations.  HPCI owns the Permanente Property, a more than 3,400 acre property in California that includes a cement plant, rock plant and quarry, which it leases to a non-debtor affiliate, Lehigh Southwest. (McChensey Decl. ¶ 10.)  Lehigh Southwest pays rent, royalties and other payments to HPCI, and Lehigh Southwest is responsible for ongoing operating costs on that property, HPCI remains responsible for capital expenditures and reclamation operations related to the property.  (Id.) HPCI also owns equity in operating subsidiaries that distribute and sell cement in the Pacific region.  (Id. ¶ 9.)  The Permanente Property and these equity interests will vest in Reorganized HPCI, which will continue to manage these assets.  (Plan § IV.A.)  As set forth in the Plan Projections, HPCI's net cash flows will exceed $6.5 million in 2020 and $2.6 million in 2021. (Plan Projections; Bittner Decl. ¶ 30.)

Additionally, non-debtor Lehigh Cement Company LLC will transfer its interests in the Real Properties, together with its rights under certain leases related to the Real Properties, to Kaiser Gypsum.  (McChensey Decl. ¶ 11; Plan § IV.C.)  The leases related to the Real Properties are expected to generate net cash flows for Kaiser Gypsum of approximately

---

million in cash, satisfying section 524(g)(2)(B)(i)(II), in part, through the contribution of a $1 million promissory note) and In re Leslie Controls, Inc., Case No. 10-12199 (CSS) (Bankr. D. Del. Jan. 10, 2011), Findings of Fact, Conclusions of Law, and Order Confirming the Second Conformed First Amended Plan of Reorganization of Leslie Controls, Inc. § U.3 (concluding that plan complies with section 524(g)(2)(B)(i)(II) of the Bankruptcy Code and confirming plan).

This Court has done so as well, albeit, in an uncontested confirmation hearing. See In re Garlock Sealing Techs. LLC, No. 3:17-CV-00275-GCM, 2017 WL 2539412, at *20 (W.D.N.C. June 12, 2017) (confirming plan where the trust was to be funded, in part, by deferred contributions in the amount of $60 million which was to be paid by a reorganized debtor no later than the first anniversary of the plan's effective date and cash contributions totaling $400 million (citing Plan §§ 7.3.2 and 7.8(1); Plan Ex. H, I, and J)).  We need not address this issue.  For not only is the Note a small part of the total funding, but the parties with an interest in the Trust (asbestos personal injury claimants, the ACC, the FCR and the Debtors) support the Plan.  Truck has objected but has no interest in the Trust and thus no standing to make this argument.

-34-

$68,000 in 2020 and $93,000 in 2021, as set forth in the Plan Projections.  (Plan Projections; Bittner Decl. ¶ 30.)

       c.     ***Section 524(g)(2)(B)(i)(III)*** requires that the trust "own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares" of each debtor."  11 U.S.C. § 524(g)(2)(B)(i)(III).  The Plan satisfies this requirement.  The Plan provides that, upon the Effective Date, the Asbestos Personal Injury Trust will receive a Payment Note in the principal amount of $1 million secured by a Pledge of 100% of the equity in the Reorganized Debtors.  (Plan §§ IV.K.2.b, I.A.98, I.A.104.)  If the Reorganized Debtors fail to pay the Payment Note in full on or before the fifth anniversary of the Effective Date, the Asbestos Personal Injury Trust can foreclose on the Pledge of the Reorganized Debtors' equity and become the 100% owner of the Reorganized Debtors.  (Id.)  This structure also complies with the language of section 524(g)(2)(B)(i)(III).[16]

       d.     ***Section 524(g)(2)(B)(i)(IV)*** requires an asbestos trust "to use its assets or income to pay claims and demands."   11 U.S.C. § 524(g)(2)(B)(i)(IV).  Here, the Asbestos Personal Injury Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims (Plan § IV.K.3.) and will use its assets, which will include the Debtors' assigned asbestos insurance rights, to resolve Asbestos Personal Injury Claims and Demands in accordance with the Plan, the Asbestos Personal Injury Trust Distribution Procedures and the Confirmation Order (Plan § IV.F.), thus satisfying the requirements of section 524(g)(2)(B)(i)(IV).

       e.     ***The Debtors are Entitled to a Discharge.***  The Debtors are entitled to a discharge under section 1141 of the Bankruptcy Code.  Pursuant to section 1141(d)(3) of the

---

[16]    See supra note 15.

Bankruptcy Code: "The confirmation of a plan does not discharge a debtor if – (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title." 11 U.S.C. § 1141(d)(3).  None of these factors is present here.

First, the Plan does not provide for the liquidation of all or substantially all of the property of the estate.  The Debtors are transferring certain of their rights under insurance policies to the Asbestos Personal Injury Trust but HPCI is retaining its other assets and Kaiser Gypsum is acquiring additional assets.  As described above, the Permanente Property will vest in Reorganized HPCI, and HPCI will also retain its equity interest in its subsidiaries.  Reorganized Kaiser Gypsum will become the owner of the Real Properties.  These assets, and the income that the Reorganized Debtors will obtain from them, is projected to be significant.  Additionally, as explained above, the Reorganized Debtors will engage in business following confirmation of the Plan.  Notwithstanding the foregoing, no release or discharge of any of the Parties or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, shall diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset.

### 2. The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code.

Section 524(g)(2)(B)(ii) of the Bankruptcy Code requires the Court to make certain factual findings to support the issuance of a channeling injunction under section 524(g)(1)(A).  As set forth below, the Debtors' history, the nature of asbestos-related

-36-

litigation and the facts of these Reorganization Cases all support the findings required for the

issuance of the Asbestos Permanent Channeling Injunction under section 524(g)(1)(A) of the

Bankruptcy Code.

a.   ***Section 524(g)(2)(B)(ii)(I)*** requires the court to find that "the

debtor is likely to be subject to substantial future demands for payment arising out of the same or

similar conduct or events that gave rise to the claims that are addressed by the injunction."

11 U.S.C. § 524(g)(2)(B)(ii)(I).

Here, the Debtors' asbestos-related liabilities arise from their manufacture

and sale of certain products that contained asbestos.  (McChesney Decl. ¶ 12.)  Since 1978, one

or both of the Debtors have been named in more than 38,000 asbestos-related lawsuits.  (Id. ¶ 14)

As of August 31, 2016, the Debtors were defendants in approximately 14,000 pending

asbestos-related bodily injury lawsuits pending in courts across the country.  (Id.)

Based on the substantial number of asbestos-related personal injury

lawsuits that were filed in the past and were continuing to be filed prior to the Petition Date, the

Debtors would likely be subject to substantial future Demands for payment arising from the same

or similar conduct or events that gave rise to the Asbestos Personal Injury Claims.  (Id. ¶ 43;

Fitzpatrick Decl. ¶ 36.)  Accordingly, section 524(g)(2)(B)(ii)(I) is satisfied.

b.   ***Section 524(g)(2)(B)(ii)(II)*** requires a court to find that "the actual

amounts, numbers, and timing of such future demands cannot be determined."  11 U.S.C.

§ 524(g)(2)(B)(ii)(II).  The Debtors are unable to predict with any degree of confidence the

amounts, numbers and timing of future Demands in respect of alleged asbestos-related personal

injuries.  (McChesney Decl. ¶ 43.)  Accordingly, section 524(g)(2)(B)(ii)(II) is satisfied.

c.      ***Section 524(g)(2)(B)(ii)(III)*** requires a finding that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands."  11 U.S.C. § 524(g)(2)(B)(ii)(III). Under the Plan, all asbestos claimants, current and future, will receive equitable treatment in accordance with the Asbestos Trust Distribution Procedures.  Without the Plan, there is a risk that present claimants will be treated more favorably than future claimants because the potential for uninsured judgments, including punitive damages, could leave the Debtors without sufficient assets to make equivalent payments to future claimants.  (McChesney Decl. ¶ 44; Fitzpatrick Decl. ¶ 37.)  Thus, the requirements of section 524(g)(2)(B)(ii)(III) are met.

d.      ***Section 524(g)(2)(B)(ii)(IV)*** requires a court to find that, as part of the confirmation process, the terms of the channeling injunction proposed, including "any provisions barring actions against third parties," are set forth in the plan of reorganization and the disclosure statement in support of the plan.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).  A court must also find that "a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan."  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  As part of the Confirmation process in these cases, the Debtors included the terms of the Asbestos Permanent Channeling Injunction, including provisions therein barring actions against any Protected Party, in both the Plan and the Disclosure Statement.  (Plan § IX.B.2; Disclosure Statement § VII.Q.2.)  The Debtors also designated Class 4 under the Plan for all Asbestos Personal Injury Claims.  (Plan §§ III.B; Disclosure Statement § VII.Q.2.)  The voting Claim holders in Class 4 unanimously accepted the Plan.  (Voting Agent Decl. ¶ 10.)

-38-

e.   ***Section 524(g)(2)(B)(ii)(V)*** requires a court to find that

the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

11 U.S.C. § 524(g)(2)(B)(ii)(V).  Here, the Asbestos Personal Injury Trust will pay Asbestos Personal Injury Claims in accordance with the Asbestos Personal Injury Trust Distribution Procedures set forth in Exhibit I.A.19 to the Plan, which contain mechanisms that provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims and future asbestos-related Demands that involve similar claims in substantially the same manner.  (Fitzpatrick Decl. ¶ 41.)

Specifically, the Asbestos Personal Injury Trust Distribution Procedures provide for the processing and payment of the uninsured portions of Insured Asbestos Claims and the Uninsured Asbestos Claims that would have been paid by the Debtors prepetition, on an impartial, first-in-first-out basis.  To ensure substantially equivalent treatment of all present and future Asbestos Personal Injury Claims, the Asbestos Personal Injury Trustee will be required to determine, with the consent of the Trust Advisory Committee and the FCR, the percentage of value that holders of present and future Asbestos Personal Injury Claims are likely to receive from the Asbestos Personal Injury Trust (the "Payment Percentage").  This determination will take account of estimates of payments related to Uninsured Amounts, the value of the Asbestos Personal Injury Trust Assets, and projected expenses.  Further, at least once every three years, the Asbestos Personal Injury Trustee will be required to reconsider the then-applicable Payment Percentage based on current information.  In determining whether to adjust the Payment

-39-

Percentage, the Asbestos Personal Injury Trustee is obligated to assess the liability forecast on

which the Payment Percentage is based against the claims filed and the Asbestos Personal Injury

Trust's corresponding payment history.  Each Distribution made to an asbestos claimant will

reflect the Payment Percentage in effect at the time of such Distribution.  To further ensure

equitable treatment of similarly-situated claims, in the event the Asbestos Personal Injury

Trustee determines it appropriate to increase the Payment Percentage, the Asbestos Personal

Injury Trustee will be required to make supplemental payments to all asbestos claimants who

previously liquidated their Asbestos Personal Injury Claims based on a lower Payment

Percentage.

Accordingly, the Asbestos Personal Injury Trust Distribution Procedures

provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a

financial position to pay, present Asbestos Personal Injury Claims and future asbestos-related

Demands in substantially the same manner.  As a result, the Plan and the Asbestos Personal

Injury Trust Distribution Procedures contemplated therein satisfy the requirements of

section 524(g)(2)(B)(ii)(V).

**3.      The Extension of the Asbestos Permanent Channeling Injunction to Third Parties Is Appropriate.**

Sections 524(g)(3)(A) and 524(g)(4)(A)(ii) of the Bankruptcy Code designate

certain entities that are protected by a channeling injunction entered pursuant to

section 524(g)(1)(A).  Specifically, section 524(g)(3)(A) provides that

> (ii) no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and

> (iii) no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall,

-40-

by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason.

11 U.S.C. § 524(g)(3)(A)(ii)-(iii).  Consistent with that section, the Plan contemplates that the Asbestos Permanent Channeling Injunction will be extended to protect the following:

> Entities that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Entity becoming such a transferee or successor [Plan § I.A.109.h.]; and

> Entities that, pursuant to the Plan or on or after the Effective Date, make a loan to any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust or to a successor to, or transferee of, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender[.] [id. § I.A.109.i.].

> In addition to the entities protected by virtue of section 524(g)(3)(A),

section 524(g)(4)(A)(ii) provides that a channeling injunction entered pursuant to section 524(g)(1)(A):

> may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—

> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

-41-

(III) the third party's provision of insurance to the debtor or a
related party; or

(IV) the third party's involvement in a transaction changing the
corporate structure, or in a loan or other financial transaction
affecting the financial condition, of the debtor or a related party,
including but not limited to —

(aa) involvement in providing financing (debt or equity), or
advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as
part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii).  As required by section 524(g)(4)(A)(ii), each Protected

Party under the Plan is either identifiable from the terms of the injunction or is a member

of an identifiable group.  (Plan § I.A.109.)  In addition, the Plan defines Protected Party

to include those parties that fit within the categories listed in section 524(g)(4)(A) of the

Bankruptcy Code.  (Id.)  Each Protected Party under the Plan therefore falls within the

groups designated in sections 524(g)(3)(A) and 524(g)(4)(A)(ii) as third parties to whom

a channeling injunction may be extended.  Accordingly, the Court may extend the

Asbestos Permanent Channeling Injunction to protect all Protected Parties from liability

for any Asbestos Personal Injury Claims.

**4.      The Rights of Persons That Might Subsequently Assert an Asbestos
Personal Injury Claim That Is a Demand Addressed by the Asbestos
Permanent Channeling Injunction and Transferred to the Asbestos
Personal Injury Trust Were Represented by the Future Claimants'
Representative.**

In accordance with section 524(g)(4)(B)(i) of the Bankruptcy Code, the FCR was

appointed as part of proceedings leading to issuance of the Asbestos Permanent Channeling

Injunction for the purpose of protecting the rights of all persons, whether known or unknown,

that might subsequently assert, directly or indirectly, against any Debtor an Asbestos Personal

Injury Claim that is a Demand addressed in the Asbestos Permanent Channeling Injunction and

-42-

transferred to the Asbestos Personal Injury Trust.  Accordingly, the Debtors have met the

requirements of section 524(g)(4)(B)(i) of the Bankruptcy Code.

> **5.      Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants.**

Section 524(g)(4)(B)(ii) of the Bankruptcy Code requires a court to determine that

entry of the channeling injunction, and the protection from liability that is afforded to the parties

named therein, "is fair and equitable with respect to the persons that might subsequently assert

such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such

debtor or debtors or such third party."  11 U.S.C. § 524(g)(4)(B)(ii).

On the Effective Date:  (a) the Reorganized Debtors and/or Lehigh Hanson on

behalf of and as a contribution to such Reorganized Debtors will pay an aggregate of $49 million

in cash to the Asbestos Personal Injury Trust; (b) the Reorganized Debtors, as co-obligors, shall

issue the Payment Note to the Asbestos Personal Injury Trust; (c) the Reorganized Debtors shall

transfer the Phase 1 Claims to the Asbestos Personal Injury Trust, free and clear of any liens,

claims or encumbrances, including any rights of setoff based on any liability of the Debtors;[17]

and (d) the Reorganized Debtors shall transfer the Asbestos Personal Injury Insurance Assets to

the Asbestos Personal Injury Trust.  (Plan § IV.K.2.)

In addition, notwithstanding any other provisions of the Plan, no release or

discharge of any of the Parties, the Creditors' Committee or any Reorganized Debtor, or any of

their respective present or former directors, officers, employees, members, subsidiaries,

---

[17]   The Debtors or the Reorganized Debtors shall pay all Debtor Appellate Costs.  The Asbestos Personal Injury Trust shall pay all Asbestos Personal Injury Trust Appellate Costs.  If the Asbestos Personal Injury Trust ultimately obtains any recovery with respect to Phase 1 Claims, whether as a result of settlement or judgment that exceeds $12 million, the Asbestos Personal Injury Trust shall remit to the Debtors or the Reorganized Debtors any amounts remaining, in excess of $12 million, after the Asbestos Personal Injury Trust Appellate Costs have been deducted from the full recovery amount.  (Plan § IV.K.2.c.)

-43-

predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, shall diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset.  (Plan IV.R.3.c).

Further, under the Plan, holders of Insured Asbestos Claims may initiate, continue and/or prosecute suit against the Reorganized Debtors in the tort system to obtain the benefit of insurance coverage under the Asbestos Insurance Policies, unless and until the Asbestos Personal Injury Trust, with the consent of the TAC and the FCR, has settled (other than pursuant to the Excess CIP Agreement) all rights to coverage for Asbestos Personal Injury Claims applicable to the Asbestos Personal Injury Claim of a particular holder.[18]  In the event that a holder of an Insured Asbestos Claim commences such an action, the complaint may name the applicable Reorganized Debtor(s) as a defendant(s) and shall be deemed by operation of law to be an action against the applicable Reorganized Debtor(s).  Notwithstanding the foregoing, the Reorganized Debtors shall have no obligation to answer, appear or otherwise participate in the action in any respect other than as set forth in the Plan and as may be necessary to maintain coverage under the Asbestos Insurance Policies, and any judgment that may be obtained in the action cannot be enforced against the assets of the Reorganized Debtors, other than from the Asbestos Insurance Policies.  (Plan IV.O.1).

In light of the substantial contributions made to the Asbestos Personal Injury Trust on behalf of all Protected Parties, entry of the Asbestos Permanent Channeling Injunction, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that

---

[18]     In the event such a settlement occurs, such holder of an Insured Asbestos Claim shall pursue payment of its Asbestos Personal Injury Claim from the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures.

might subsequently assert future asbestos-related Demands.  Accordingly, the Debtors have satisfied the requirements of section 524(g)(4)(B)(ii).

### I.    COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES.

Pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions in the Plan, including the settlement of certain estate claims set forth in Section IV.R.2 and the releases set forth in Section IV.R.3, constitute a good-faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Claim, Asbestos Personal Injury Claim or Interest or any Distribution to be made pursuant to the Plan on account of any Allowed Claim, Asbestos Personal Injury Claim or Interest.

### J.    SATISFACTION OF CONDITIONS TO CONFIRMATION.

1.    Section VIII.A of the Plan contains conditions precedent to Confirmation that must be satisfied or duly waived pursuant to Section VIII.C of the Plan.  The conditions precedent set forth in Sections VIII.A.1 through VIII.A.5 of the Plan have been satisfied.

2.    Concerning the establishment of the Asbestos Personal Injury Trust and issuance of the Asbestos Permanent Channeling Injunction, the Court specifically finds:

a.    The Asbestos Permanent Channeling Injunction is to be implemented in connection with the Plan and the Asbestos Personal Injury Trust.

b.    The Asbestos Personal Injury Trust, as of the Effective Date, shall assume all liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims, and, upon such assumption, no Protected Party shall have any liability or responsibility, financial or otherwise, therefor. Provided, however, the Plan provides that holders of Insured

-45-

Asbestos Claims may initiate, continue and/or prosecute suits against the Reorganized Debtors in the tort system to obtain the benefit of insurance coverage under the Asbestos Insurance Policies, unless and until the Asbestos Personal Injury Trust, with the consent of the TAC and the FCR, has settled (other than pursuant to the Excess CIP Agreement) all rights to coverage for Asbestos Personal Injury Claims applicable to the Asbestos Personal Injury Claim of a particular holder, in which event such holder shall pursue payment of its Asbestos Personal Injury Claim from the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures.

In the event that a holder of an Insured Asbestos Claim commences such an action, the complaint may name the applicable Reorganized Debtor(s) as a defendant(s) and shall be deemed by operation of law to be an action against the applicable Reorganized Debtor(s).

c.      Notwithstanding the foregoing, the Reorganized Debtors shall have no obligation to answer, appear or otherwise participate in the action in any respect other than as set forth in the Plan and as may be necessary to maintain coverage under the Asbestos Insurance Policies, and any judgment that may be obtained in the action cannot be enforced against the assets of the Reorganized Debtors, other than from the Asbestos Insurance Policies.

d.      As of the Petition Date, each Debtor had been named as a defendant in a personal injury or wrongful death action seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

e.      The Asbestos Personal Injury Trust will be funded in whole or in part by securities of the Reorganized Debtors and by the obligation of such Reorganized Debtors

-46-

or Debtors to make future payments, which payments may be funded by contributions from

Lehigh Hanson to the Reorganized Debtors.

f.       The Asbestos Personal Injury Trust, by the exercise of rights

granted under the Plan, will be entitled to own, if specified contingencies occur, a majority of the

voting shares of each of the Reorganized Debtors.

g.       The Asbestos Personal Injury Trust shall use its assets or income to

pay Asbestos Personal Injury Claims, including Demands.

h.       Each of the Debtors is likely to be subject to substantial future

Demands for payment arising out of the same or similar conduct or events that gave rise to the

Claims that are addressed by the Asbestos Permanent Channeling Injunction.

i.       The actual amounts, numbers and timing of such future Demands

cannot be determined.

j.       Pursuit of such Demands outside the procedures prescribed by the

Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

k.       The terms of the Asbestos Permanent Channeling Injunction,

including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of

the Bankruptcy Code, are set out in the Plan.

l.       The Plan establishes, in Class 4 (Asbestos Personal Injury Claims),

a separate class of the claimants whose Claims are to be addressed by the Asbestos Personal

Injury Trust.

m.       At least two-thirds in amount and 75% in number of those voting

Claims in Class 4 (Asbestos Personal Injury Claims) have voted in favor of the Plan.

-47-

n. Pursuant to court orders or otherwise, the Asbestos Personal Injury Trust shall operate through mechanisms, such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims, that provide reasonable assurance that the Asbestos Personal Injury Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims, including Demands, in substantially the same manner.

o. Each Protected Party is identifiable from the terms of the Asbestos Permanent Channeling Injunction by name or as part of an identifiable group, and each Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on a Debtor to the extent that such alleged liability arises by reason of one or more of the following:

i. such Entity's ownership of a financial interest in any Debtor or Reorganized Debtor, or any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor;

ii. such Entity's involvement in the management of any Debtor, Reorganized Debtor or predecessor in interest of any Debtor or Reorganized Debtor;

iii. such Entity's service as an officer, director or employee of any Debtor, Reorganized Debtor, any past or present Affiliate of any of Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor or Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor; or

-48-

iv.      such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, any predecessor in interest of any Debtor or Reorganized Debtor or of an Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, any past or present affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor, including (A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (B) acquiring or selling financial interest in any Entity as part of such transaction.

p.      The FCR was appointed as part of proceedings leading to issuance of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against any Debtor an Asbestos Personal Injury Claim that is a Demand addressed in the Asbestos Permanent Channeling Injunction and transferred to the Asbestos Personal Injury Trust.

q.      Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Asbestos Permanent Channeling Injunction is fair and equitable with respect to individuals that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Personal Injury Trust by or on behalf of any such Protected Party.

r.      The Plan and the Asbestos Personal Injury Trust Documents comply with section 524(g) of the Bankruptcy Code in all respects.

-49-

s.       The Plan and Exhibits are a fair, equitable and reasonable

resolution of the liability of the Debtors for the Asbestos Personal Injury Claims.

t.       The FCR has adequately and completely fulfilled his duties,

responsibilities and obligations as the representative for the individuals referred to in finding

Section I.J.p above in accordance with section 524(g) of the Bankruptcy Code.

u.       Adequate and sufficient notice of the Plan and the Confirmation

Hearing, as well as all deadlines for objecting to the Plan, has been given to (i) all known

creditors and holders of Interests, (ii) parties that requested notice in accordance with Bankruptcy

Rule 2002 (including the ACC and the FCR), (iii) all parties to Executory Contracts and

Unexpired Leases, (iv) all taxing authorities listed on the Debtors' Schedules or in the Debtors'

Claims database, in each case, (v) the Department of the Treasury by service upon the District

Director of the IRS, (vi) state attorney generals and state departments of revenue for states in

which any of the Debtors have conducted business, and (vii) the Securities and Exchange

Commission, (A) in accordance with the solicitation procedures governing such service and (B)

in substantial compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b).  Such transmittal

and service were adequate and sufficient, and no other or further notice is or shall be required.

v.       The Debtors' conduct in connection with and throughout these

Reorganization Cases, including, but not limited to, their negotiations with the ad hoc committee

of asbestos personal injury claimants and the prepetition future claimants' representative, and the

commencement of these Reorganization Cases, as well as the drafting, negotiation, proposing,

confirmation, and consummation of the Plan, and their opposition to any other plan of

reorganization, does not and has not violated any Asbestos Insurer Cooperation Obligations

contained in any Asbestos Insurance Policies, nor was such conduct a breach of any express or

implied covenant of good faith and fair dealing.  The Objecting Excess Insurers' consent to this finding in the particular facts and circumstances of these Reorganization Cases is expressly without prejudice to the rights of any party to contend that such a finding is or is not appropriate in any subsequent bankruptcy case not involving these Debtors.  (This provision is referred to herein as the "Plan Finding.")

### K.   THE PLAN IS INSURANCE NEUTRAL.

The Plan is insurance neutral.  Specifically, the Plan's insurance neutrality provision found in section IV.Q expressly preserves all "Insurer Coverage Defenses," which is defined to include "all defenses at law or in equity that any Asbestos Insurer may have under applicable non-bankruptcy law to provide insurance coverage to or for Asbestos Personal Injury Claims" and states that the transfer of insurance rights to the Asbestos Personal Injury Trust "shall not affect the liability of any Asbestos Insurer."  (Plan §§ I.A.84, IV.Q.)  The Plan also states that "the discharge and release of the Debtors and Reorganized Debtors from all Claims and the injunctive protection provided to the Debtors, Reorganized Debtors and Protected Parties with respect to Claims as provided herein shall not affect the liability of any Asbestos Insurer." (Id. § IV.Q.)  Thus, the Plan neither increases Truck's obligations nor impairs its prepetition contractual rights under the Truck Policies.  The Plan simply restores Truck to its position immediately prior to the Petition Date.

Moreover, the Plan expressly provides that the Reorganized Debtors will continue to fulfill their cooperation obligations arising under the Asbestos Insurance Policies, including the Truck Policies.  (Plan § IV.L.1 ("The Reorganized Debtors shall have a continuing obligation to satisfy the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence Provisions set out in the Asbestos Insurance Policies."), IV.L.2 ("Enforcement of Reorganized Debtors' Obligations to Cooperate with Respect to Insurance Matters")).  Thus, although the

Asbestos Insurers may not argue that the Debtors' conduct in filing and prosecuting these

Reorganization Cases, or in pursuing and consummating the restructuring provided under the

Plan, breached the Asbestos Insurer Policies, its rights to pursue coverage defenses to individual

Asbestos Personal Injury Claims for any alleged post-Effective Date violations by the

Reorganized Debtors remain intact.  Put differently, the Plan restores each insurer to the position

it was in immediately prior to the Petition Date, with its rights and obligations under the

applicable Asbestos Insurer Policies left undisturbed, as if the Debtors' bankruptcy had never

occurred.  Such treatment does not diminish Truck's rights or increase its burdens under the

Truck Policies.

Truck has limited standing to object to the Plan solely on the grounds that the

Plan is not insurance neutral, including, within that limited context, that the Debtors are in

violation of the Assistance and Cooperation Clause and are therefore not entitled to the Plan

Finding.  However, because the Plan is insurance neutral and returns Truck to the tort system

exactly as it was prepetition, Truck does not have standing to advance confirmation issues such

as contentions that:  the Plan is collusive and not in good faith; the Debtors are not entitled to a

discharge; or the elements of 11 U.S.C. § 524(g) are not met.  Nor does Truck obtain standing to

object to confirmation because it is also a creditor in this case.  Truck is an unsecured creditor,

and unsecured creditors are unimpaired under the Plan.

Despite finding and concluding that the Plan is insurance neutral and that Truck

lacks standing to object to the Plan on the grounds set forth herein, the Court has considered

Truck's objections and, in light of the record before it, alternatively finds and concludes that

Truck's objections lack merit and should be overruled in their entirety for the reasons stated

herein and in the Bankruptcy Court's oral ruling made on the record at the hearing held August

13, 2020.[19]

### 1. Truck Has No Interest in the Asbestos Personal Injury Trust.

Truck objects to the Plan on the basis that the Asbestos Personal Injury Trust does

not comply with the structure and funding requirements of section 524(g) of the Bankruptcy

Code.  Truck, however, will not be entitled to any Distributions from the Asbestos Personal

Injury Trust, nor do the terms of the trust have an effect on the Truck's obligations under the

Asbestos Insurance Policies.[20]  Due to the absence of any injury to its interests, Truck lacks

standing to argue that the Asbestos Personal Injury Trust fails to satisfy the requirements of

section 524(g) of the Bankruptcy Code.

### 2. Even If it Had Standing, Truck's Arguments about the Plan's Treatment of Its Breach Claim Are Overruled.

Truck contends that the Plan violates the Assistance and Cooperation Clause[21] in

its policies (as well as an implied covenant of good faith and fair dealing), resulting in the loss of

coverage under the Truck Policies.  As such, Truck objects to the Plan Finding.

Addressing first this Court's jurisdiction, because the Plan Finding deals with core

matters, it can be made by this Court.  It is undisputed that the Debtors had insurance coverage as

of the Petition Date.  Accordingly, the finding is a bankruptcy matter arising in Title 11 because

it would have no existence outside of bankruptcy.  The actions that Truck contends violate the

---

[19]  The Bankruptcy Court permitted Truck to fully participate in the confirmation process, including participating in pre-hearing discovery, filing pre-hearing briefs, and in presenting argument and evidence at the Confirmation Hearing.

[20]  In the event the Asbestos Personal Injury Trust and Truck reach a post-Confirmation agreement, the agreement is subject to Section IV.M.3.a of the Plan and notice to the Objecting Excess Asbestos Insurers and approval by the Bankruptcy Court.  (Plan § I.A.120.)

[21]  Defined below.

-53-

Truck Policies and relieve it of its obligations under those policies all relate to whether the Plan

should have been confirmed, the legality of its provisions, the good faith of the Plan Proponents,

and the conduct of the parties during the Reorganization Cases case.  Those are all core

bankruptcy matters.  Travelers Cas. and Sur. Co. v. Skinner Engine Co., Inc. (In re Am. Capital

Equip., LLC), 325 B.R. 372, 377-78 (W.D. Pa. 2005).

These issues do not need to be decided in the adversary proceeding Truck filed in

the District Court.  The Truck adversary is effectively a bankruptcy confirmation objection.  But

it relates to core matters, meaning those issues do not need to be decided in the Truck adversary.

In any case, resolving the merits of Truck's contention do not implicate any jury trial right.

There is no disputed issue of fact.

That the finding addresses a state law contract is of no moment.  Core

proceedings often deal with state-law rights, and contract rights, in particular.  Any bankruptcy

plan deals with contract rights, and often modifies them.  And in this case, this adjudication of

these rights would not exist outside of a bankruptcy environment, so they are core.

Truck's contention that the Plan impairs its contract rights is based on a false

premise:  the notion that its contract gives it the right to collaterally attack elsewhere a

confirmation ruling and make determinations of the propriety of the parties' conduct in the

course of this case.  Such rights never existed under the Truck Policies, and to the extent they

did, they would be preempted by the Bankruptcy Code.  See, e.g., In re Federal-Mogul Glob.

Inc., 684 F.3d 355, 382 (3d Cir. 2012).

Finally, the Plan does not violate the Truck policy.  Truck is an insurer who

contracted to defend the Debtors' asbestos claims in the state and federal court system, and Truck

is being sent back to defend these claims in the court system.  This does not violate the Truck

-54-

policies.  Nor does the Assistance and Cooperation Clause in the Truck Policies require the Debtors to take strategic direction from their insurer in bankruptcy.  Admiral Ins. Co. v. Grace Indus., Inc., 409 B.R. 275, 283 (E.D.N.Y. 2009) ("[T]he cooperation clause only required Grace to assist in the ultimate disposition of the actual claims, not to take on a partner to make litigation decisions solely regarding Grace's own bankruptcy reorganization.").  Here, that the Plan did not contain features that Truck would have preferred does not violate the terms of the Truck Policies.

**L.     TRUCK'S COURSE OF CONDUCT BEFORE THE BANKRUPTCY COURT.**

Truck raised its confirmation objection with the Bankruptcy Court before refiling it as the Complaint (as defined below), including in its First Amended Disclosure Statement for the First Amended Truck Plan [D.I. 1204 at 2] and in a confirmation objection filed on November 6, 2018 [Conf. Exhibit 95 at 19-20].  Truck later sent a "reservation of rights" letter to the Debtors' counsel, dated April 3, 2019, asserting that the Debtors had, solely as a result of their efforts in furtherance of the Reorganization Cases, breached the "Assistance and Cooperation Clause" in the Truck Policies and threatening to deny coverage if the Debtors did not capitulate and either support Truck's competing plan or revise the Plan to benefit Truck. [Conf. Exhibit 62].  Truck raised its objection again on June 6, 2019, as a supplemental objection to a prior version of the Plan and Disclosure Statement [D.I. 1682], arguing that the Debtors must file an adversary proceeding to resolve the dispute.  Then, approximately ten months after first raising its objection and on the eve of the Bankruptcy Court's September 4, 2019 ruling on Truck's and the Debtors' competing disclosure statements, Truck filed its Complaint for Declaratory Relief [Adv. Proc. 19-3052, D.I. 1] (the "Complaint"),[22] alleging that its

---

[22]     The Complaint requests declaratory judgments that the Debtors breached their duty of assistance and cooperation, as well as the implied covenants of good faith and fair dealing, under the Truck Policies and

-55-

confirmation objection was a state-law insurance dispute that was non-core and must be tried

before a jury in the District Court.  Truck then filed its Motion to Withdraw the Reference of

Adversary Proceeding to the Bankruptcy Court [Civ. No. 19-0467-GCM, D.I. 1] and its brief in

support [Civ. No. 19-0467-GCM, D.I. 1-1] ("Truck's Adversary Brief").[23]  The District Court

stayed the matter until the Bankruptcy Court ruled on the Plan.  Order [Civ. No. 19-0467-GCM,

D.I. 3].

Contrary to Truck's assertions,[24] the Complaint is not an insurance coverage

action that happened to take place at the same time as the Reorganization Cases.  It is a

declaratory judgment action filed by the Debtors' primary general liability insurer seeking to

avoid any and all liability for Insured Asbestos Personal Injury Claims under the Truck Policies

(the primary asset of the Debtors' estates), based solely on the Debtors' actions in support of the

Reorganization Cases and confirmation of the Plan.  See, e.g., In re Am. Capital Equip., 325 B.R.

at 377-78 ("Travelers itself has framed the issues in its declaratory judgment complaint such that

the claims and rights that it asserts could arise only in the context of this bankruptcy case and

would not exist independent of the bankruptcy environment.  As such, we find that the adversary

proceeding is core.").  The Plan Finding is a necessary part of the confirmation process given

that the right to receive the proceeds of the Truck Policies comprises the majority of the ultimate

value of the Asbestos Personal Injury Trust Assets.  See id.  Because of this, Confirmation of the

Plan must include a ruling that Truck cannot use the Reorganization Cases and actions taken in

---

that, as a consequence, Truck is relieved of its contractual obligations under the policies.  The Complaint
also requests a declaratory judgment that the Debtors are not entitled to the Plan Finding.

23    Truck incorporated its Adversary Brief into the terms of its Objection.  Objection [D.I. 2070] at 25.

24    Truck asserts that it never raised the allegations in its Complaint as a confirmation objection.  As the
Bankruptcy Court found, however, Truck inserted its coverage-based arguments into the confirmation
process.  Bankr. Hrg Tr. 25:10-15 ("This was a variety of threats being made to block confirmation or to
avoid coverage until [Truck] got what it wants in the confirmation process.").

furtherance of such cases as a defense to coverage after the Plan is confirmed or to collaterally attack the Confirmation Order with another court.

The record clearly shows that Truck's Complaint, its Objection and the Plan Finding are each inextricably intertwined with both each other and the Plan confirmation process, including findings and conclusions the Court must make regarding whether the Plan and the Plan Proponents have complied with the applicable provisions of the Bankruptcy Code under section 1129(a)(1) and (2); whether the Plan has an adequate means of implementation and was proposed in good faith and not by any means forbidden by law under sections 1123(a)(5) and 1129(a)(3); whether the Plan is feasible under section 1129(a)(11); and whether the Plan meets the requirements of section 524(g).  These are all statutory-based confirmation matters that fall within the jurisdiction of this Court under 28 U.S.C. § 1334 and that must be raised in the context of the Reorganization Cases.  See, e.g., Special Metals Corp., 317 B.R. at 330-331 (debtors' confirmed plan was res judicata upon liability of insurers and precluded insurers from asserting that they had been relieved of their contractual obligations under policies).  That the Plan Finding addresses a matter of state law is of no moment.  See 28 U.S.C. § 157(b)(3) ("A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.")

## II.    CONCLUSIONS OF LAW.

### A.    JURISDICTION AND VENUE.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code.  Venue of the Reorganization Cases is proper under 28 U.S.C. §§ 1408 and continues to be proper.

**B.     APART FROM ISSUES RELATED TO INSURANCE NEUTRALITY, TRUCK LACKS STANDING TO OBJECT TO THE PLAN.**

While there is no requirement that a section 524(g) plan be insurance neutral, because the Plan is insurance neutral (see Section I.K. above), Truck lacks standing to object to Confirmation of the Plan.  See, e.g. In re Pittsburgh Corning Corp., 417 B.R. 289, 317 (Bankr. W.D. Pa. 2006) (finding plan insurance neutral and, therefore, insurers had no standing to object to confirmation); In re Combustion Eng'g, Inc., 391 F.3d at 218, as amended (Feb. 23, 2005) (holding that insurers lacked standing insofar as the plan did not affect their rights); Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp., 518 B.R. 307, 329 (W.D. Pa. 2014) (concluding that the insurer's "arguments that it has standing are without merit" because "[t]he plan did not dramatically increase the 'quantum of liability,' harm . . . [insurer's] contractual rights, or increase its administrative burdens"); J T Thorpe Co., No. 02-41487-H5-11, 2003 WL 23354129, at *1 (Bankr. S.D. Tex. Jan. 30, 2003) (noting that the district court had affirmed the bankruptcy court's prior ruling sustaining the debtors' objection to insurers' standing to object to the disclosure statement and the plan); In re Fuller-Austin Insulation, No. 98-2038-JJF, 1998 WL 812388, at *1 (D. Del. Nov. 10, 1998) (holding that insurers lacked standing to object to both the approval of the disclosure statement and the plan itself because the plan preserved insurers' rights in coverage litigation).[25]

Even absent insurance neutrality, Truck lacks standing to object to the structure and funding of the Asbestos Personal Injury Trust because Truck has no interest in the trust and

---

[25]     Truck holds a General Unsecured Claim against the Estates; however, that Claim will be paid in full under the Plan. Plan § III.B.3.  Truck is not raising its objection as the holder of an unimpaired Claim, but as an insurer that is not satisfied with the outcome of the Reorganization Cases, despite the fact that the Plan is insurance neutral.  But a debtor is not required to take on a partner in its bankruptcy case or to make litigation decisions for the benefit of insurers. See Bankr. Hr'g Tr. (8/13/2020) at 18:12-19:1.

the trust will have no effect on its legal or pecuniary interests (see Section I.K. above).[26]  In

objecting to the Plan on this basis, Truck is impermissibly asserting the rights of third-party

asbestos claimants.  See Combustion Eng'g, Inc, 391 F.3d at 248 ("While . . . [insurers] argue

that § 524(g)(2)(B)(i)(II) is not satisfied, they do not have standing to raise this matter."); In re

A.P.I., Inc., 331 B.R. 828, 867 (Bankr. D. Minn. 2005) ("[T]he insurers cannot be heard in

objection to the plan on its conformity with either § 524(g)(2)(B)(i)(II) or (i)(III)."), aff'd sub

nom.  OneBeacon Am. Ins. Co. v. A.P.I., Inc., 2006 WL 1473004 (D. Minn. May 25, 2006).

### C.    ENTRY OF THE PLAN FINDING IS PROPER.

#### 1.    Truck Has Received All Necessary Procedural Protections.

Truck argues that Bankruptcy Rule 7001(2) requires that any ruling regarding its

Complaint, Objection and the Plan Finding be made in the context of an adversary proceeding,

not a contested confirmation hearing.  Truck Adversary Brief [Adv. Proc. 19-3052, D.I. 5-1] at 2

(citing FED. R. BANKR. P. 7001(2) ("The following are adversary proceedings: . . . a proceeding

to determine the validity, priority, or extent of a lien or other interest in property….")).

Bankruptcy Rule 7001(2) does not require this result.  Neither Truck's Complaint nor Objection

(a) challenges the Debtors' ownership of the Truck Policies, (b) alleges that Truck holds a

competing interest in the Truck Policies or (c) argues that Truck is entitled to the proceeds of the

Truck Policies.  To the contrary, Truck alleges that the Debtors' conduct in furtherance of the

Reorganization Cases breached the Truck Policies.  These breach of contract claims do not

---

26    Courts consider standing on claim-by-claim basis.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servo
(TOC), Inc., 528 U.S. 167, 185 (2000) (standing is determined on an ad hoc basis, and party "must
demonstrate standing separately for each form of relief sought"); accord Rosen v. Tenn. Comm'r of Fin. &
Admin., 288 F.3d 918, 928 (6th Cir. 2002) ("It is black-letter law that standing is a claim-by-claim issue.");
Sentinel Trust Co. v. Newcare Health Corp. (In re Newcare Health Corp.), 244 B.R. 167, 172 (BAP 1st Cir.
2000) ("In bankruptcy, a party may have standing for some matters and not for others.") (citing In re
Tascosa Petroleum Corp., 196 B.R. 856 (D. Kan. 1996)).

require the Court to determine the validity, priority or extent of a lien or other interest in property.  See, e.g., U.S. Brass Corp., 110 F.3d 1216, 1268 (7th Cir. 1997) ("The issue in these cases is the scope of the insurance policies, an issue of contractual interpretation, not their ownership.").

Because an adversary proceeding is not required, Truck's Complaint and Objection were properly considered in connection with the Confirmation Hearing.  See Ralls v. Decktor Pet Ctrs, Inc., 177 B.R. 420, 428 (D. Mass. 1995) ("Matters not listed in Rule 7001 proceed via a 'contested matter' hearing."); In re Aegis Mortg. Corp., Adv. No. 08-50237, 2008 WL 2150120, at *7 (Bankr. D. Del. May 22, 2008) ("Scott cannot seek to enforce this claim for money damages through an adversary proceeding because the relief he seeks is not of a type enumerated in Rule 7001."); see also In re Duncan, 448 F.3d 725, 727 n.1 (4th Cir. 2006) (describing an adversary proceeding as an action brought "for one or more of the reasons specified in Bankruptcy Rule 7001.").

Moreover, the fundamental components of due process are the right to be heard after notice that is reasonably calculated under the circumstances to apprise a party of the pendency of a matter and adequate to afford that party of an opportunity to object.  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  The contested Confirmation Hearing before the Bankruptcy Court, coupled with this Court's *de novo* review process, satisfies these requirements.  The record shows that Truck received notice and an opportunity to be heard, filed written objections to the Plan that mirrored those contained in the Complaint,[27] participated in approximately six months of confirmation-related discovery that included matters surrounding

---

[27]     Truck's Objection incorporates and repeats the same arguments it made in support of its motion to withdraw the reference regarding its Complaint.  Obj. at 25.

-60-

the Debtors' alleged breach of the Truck Policies and presented evidence and argument at the

Confirmation Hearing.  See, e.g., Objection [D.I. 2070, supporting exhibits at D.I. 2072]; Conf.

Exhibits 6-12 (Truck's responses and objections to discovery requests), 29-36 (the Debtors and

Truck's joint exhibits), 37-74 (Truck's exhibits admitted into evidence), 55-61 (responses and

objections to Truck's discovery requests); see generally Bankr. Hr'g Trans. August 13, 2020.[28]

The record clearly reflects that Truck has received all procedural protections

necessary to permit this Court or the Bankruptcy Court to dispose of Truck's Complaint and

Objection in the context of Plan confirmation upon *de novo* review of the Bankruptcy proposed

findings of fact and conclusions of law.  Truck's alleged right to a jury trial does not change this

analysis.  See, e.g., Barber v. Kimbrell's, Inc., 577 F.2d 216, 221 n.12 (4th Cir. 1978) ("[W]here

summary judgment is properly granted, no Seventh Amendment issue arises."); Smith v.

Kitchen, 156 F.3d 1025, 1029 (10th Cir. 1997) (holding that when a plaintiff fails to plead

sufficient facts to overcome a motion to dismiss, there are "no facts to be 'tried' by a jury").

> **2.    As a Matter of Law, the Debtors' Acts and/or Omissions Leading Up to and During the Reorganization Cases Did Not Breach the Assistance and Cooperation Clause or Any Other Express Provision of the Truck Policies.**

Truck's relationship to the Debtors is governed solely by contract.

Aerojet-General Corp. v. Transport Indemn. Co., 17 Cal. 4th 38, 76 (1997).[29]  "[I]nterpretation of

---

[28]    Bankruptcy Rule 9014, which governs contested matters, requires that the fundamental requisites of due process be satisfied in the same manner as in an adversary proceeding.  See FED. R. BANKR. P. 9014(b) ("The motion shall be served in the manner provided for service of a summons and complaint by Rule 7004[.]").  Bankruptcy Rule 9014 also incorporates a significant portion of the rules governing adversary proceedings.  Id. Rule 9014(c), (d).

[29]    The parties agree that as applied to coverage for Asbestos Personal Injury Claims, California law governs interpretation of the Truck Policies.  See, e.g., D.I. 2438 (Court order submitted by agreement of the parties applying California law to policy dispute); D.I. 2328 at 7 (Truck conceding California law applies to application of statute of limitations under Debtors' insurance policy claims); D.I. 5-1 (Adv. Pro. Case 19-03052) at 12 (Truck stating its policy rights are controlled by California law).

an insurance policy is a question of law." Waller v. Truck Ins. Exch., 11 Cal. 4th 1, 18 (1995);

Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1264 (1992) (despite special features,

ordinary rules of contract interpretation apply to insurance contracts). Where possible, the Court

infers the parties' intent solely from the written provisions of the insurance policy. AIU Ins. Co.

v. Superior Court, 51 Cal. 3d 807, 822 (1990); see Bank of the West, 2 Cal. 4th at 1264 (where

policy language "is clear and explicit, it governs").

Truck contends that, upon Confirmation, the Debtors' actions in furtherance of

their Reorganization Cases will constitute a breach of the Assistance and Cooperation Clause in

the Truck Policies. See, e.g., Conf. Exhibit 95, Objection to Motion for Approval of Debtors'

Disclosure Statement at 19-20; Conf. Exhibit 62, April 3 Reservation of Rights Letter;

Complaint ¶¶ 16-17, 64-68, Prayer ¶¶ (a)-(b); Hoyt Dep. at 74:4-75:25.[30] That provision, in its

entirety, provides as follows:

> **8. ASSISTANCE AND COOPERATION OF THE INSURED**
> The insured shall cooperate with the Company [Truck], and upon
> the Company's request, shall attend hearings and trials and shall
> assist in affecting settlements, securing and giving evidence,
> obtaining the attendance of witnesses and in the conduct of suits.
> The insured shall not, except at his own cost, voluntarily make any
> payment, assume any obligation or incur any expense other than
> for such immediate medical and surgical relief to others as shall be
> imperative at the time of the occurrence.

Conf. Exhibit 30, 1974 Truck Policy at TRK 0000586 (the "Assistance and Cooperation

Clause").[31]

---

[30]   Although Truck's Objection alleges that these breaches already have occurred (see generally, D.I. 2070)
Truck's Rule 30(b)(6) corporate witness, Scott Hoyt, clarified that the Debtors' breach of their policy
obligations only will occur at the time a plan is confirmed without fraud protection mechanisms like those
imposed in In re Garlock Sealing Techs., LLC, 504 B.R. 71 (Bankr. W.D.N.C. 2014) ("Garlock").
See Hoyt Dep. at 28:6-29:7; 177:16-180:11; 192:13-195:6.

[31]   The Assistance and Cooperation Clause is included within Asbestos Insurer Cooperation Obligations as
that term is defined in the Plan.

This Court has jurisdiction to apply well-settled rules of insurance policy interpretation to evaluate the Assistance and Cooperation Clause and to determine whether and how they apply to the Debtors' conduct in these bankruptcy proceedings. See E.M.M.I. Inc. v. Zurich Am. Ins. Co., 32 Cal. 4th 465, 470 (2004) ("The proper question is whether the [provision or] word is ambiguous in the context of this policy and the circumstances of this case"). Although Truck argues that this involves "an inherently factual finding" or will result in a "novel legal ruling on state law insurance policy coverage issues" (D.I. 2359 at 11), Truck admits that that "[t]he relevant part of the Assistance and Cooperation provision of the Truck policies is straightforward" and that Truck "seeks only to hold the Debtors to their *enumerated* policy obligations." D.I. 2359 at 11, 13 (emphasis added). This Court can determine the Debtors' obligations under the Assistance and Cooperation Clause as a matter of contractual interpretation "solely from the written provisions of the insurance policy." AIU Ins. Co., 51 Cal. 3d at 822; Bank of the West, 2 Cal. 4th at 1264; see Bankr. Hr'g Tr. at 25:23-25 Conf. Exhibit 7, Truck's Responses and Objections to Debtors' First Set of Requests for Production ("The meaning of the [Assistance and Cooperation] Clause is set by its text and by relevant case law. The interpretation of the [Assistance and Cooperation] Clause is a legal question for the Court on which no discovery is required or appropriate.").

Truck asks the Court to construe the term "cooperate" to require Debtors to undertake, in their own bankruptcy proceedings, to secure certain disclosures that Truck claims are necessary to prevent alleged or assumed fraud. Such an interpretation offends well-settled rules of insurance policy interpretation.

First, the specific examples of things that the Debtors are obligated to do under the Assistance and Cooperation Clause establish that assistance and cooperation must be

-63-

provided, when requested by Truck, in connection with Truck's defense efforts in individual suits

(i.e., attending hearings and trials, affecting settlements, securing and giving evidence, obtaining

the attendance of witnesses and "in the conduct of suits").  A plain reading of the Truck Policies

evidences that the parties, at the time of contracting, intended the Assistance and Cooperation

Clause to apply to the enumerated activities, as well as other activities of like kind, "in the

conduct of suits."  See Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 338 (9th Cir. 1996) (applying

California law, interpreting policy language narrowly in the context in which it appears); Martin

Marietta Corp. v. Ins. Co. of N. Am., 40 Cal. App. 4th 1113, 1126 (1995) ("where general words

follow a specific enumeration, the general words should not be construed in their broadest sense

but should be read as applying to the same general class of things as the specifically enumerated

things").

Although cooperation can refer to several things, it always relates to the defense of

individual cases in the context of liability insurance.  For instance, courts "have construed

cooperation provisions to impose an obligation to:  (a) provide the insurer with a full and truthful

account of the occurrence, and to satisfy the insurer's reasonable request for information on the

underlying details of the case; (b) assist the insurer by forwarding notices, summonses, pleadings

or other suit papers, so that the insurer may promptly prepare a defense against a third-party

complaint; (c) submit to an examination under oath, or otherwise make himself available for

trial, as the insurer conducts his defense; and (d) cooperate in the substantive aspects of his

defense, such as filing third-party actions when requested and avoiding settlement without the

-64-

approval of the insurer."  Kallis, et al., Policyholder's Guide to the Law of Ins. Coverage § 24.03 (1st ed. 2019 Supp. 2012).[32]

Second, Truck contends that the Debtors have breached the Truck Policies by "colluding" with litigation adversaries (i.e., the ACC and the FCR) to negotiate and sponsor a plan that would require Truck to defend current and future Asbestos Personal Injury Claims against the Debtors without access to certain exposure evidence that Truck wants, such as Garlock-style "fraud prevention measures" that could have been included in the plan.  D.I. 2070 at 27-31.  However, the typical pattern giving rise to a claim of improper collusion by an insured is where, in the context of a third-party lawsuit, the insured agrees with the claimant to an amount of liability, stipulates to judgment and then assigns to the claimant the right to satisfy that judgment from an insurance policy, combined with a covenant by the claimant not to sue the insured.  See, e.g., Safeco Ins. Co. of Amer. v. Parks, 170 Cal. App. 4th 992, 1013 (2009) ("[C]ollusion occurs when the insured and the third party claimant work together to manufacture a cause of action for bad faith against the insurer or to *inflate the third party's recovery* to artificially increase damages flowing from the insurer's breach . . . .  The insurer may raise collusion as a defense in a subsequent bad faith action.") (emphasis added); Andrade v. Jennings, 54 Cal. App. 4th 307, 327 (1997) ("Collusive assistance in the procurement of a judgment not only constitutes a breach of the cooperation clause but also is a breach of the covenant of good faith and fair dealing.").  There is no prejudice to Truck here.  Rather, the Plan returns Asbestos Personal Injury Claims to the tort system and places Truck in the same position it was in before the Debtors' bankruptcy.  See Hoyt Dep. 108:17-109:15.

---

[32]   Truck admits that before these bankruptcy proceedings, the Debtors always had fulfilled their defense-related obligations under the Assistance and Cooperation Clause.  Hoyt Dep. at 19:2-20:13, 27:13-29:7.

-65-

Third, the Assistance and Cooperation Clause is not reasonably susceptible to the meaning that Truck advocates—i.e., that the Assistance and Cooperation Clause can be used to control the Debtors' conduct in their own bankruptcy.  Admiral Ins. Co. v. Grace Indus., Inc., 409 B.R. 275, 283 (E.D.N.Y. 2009) ("[T]he cooperation clause only required Grace to assist in the ultimate disposition of the actual claims, not to take on a partner to make litigation decisions solely regarding Grace's own bankruptcy reorganization.").  Belying Truck's novel argument, case law interpreting and applying this standard form policy language repeatedly and consistently measures cooperation in the context of individual suits.[33]

> **3.** **As a Matter of Law, the Debtors' Acts and/or Omissions Leading Up to And During the Reorganization Cases Did Not Breach the Covenant of Good Faith and Fair Dealing Implied Into the Truck Policies.**

Truck's argument that, upon Confirmation, the Debtors' actions in furtherance of their Reorganization Cases will constitute a breach of the covenant of good faith and fair dealing implied by law into the Truck Policies is even weaker.

Under California law, "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."  Comunale v. Traders & Gen. Ins. Co., 50 Cal.2d 654, 658 (1958).  However, the duty of good faith and fair dealing cannot impose upon an insured any obligation that differs from the insured's express obligations under the policy.

---

[33] For instance, an insurer's duty to indemnify is excused only if its ability to provide a defense in an underlying case has been substantially prejudiced by an insured's failure to cooperate.  Truck Ins. Exch. v. Unigard Ins. Co., 79 Cal. App. 4th 966, 976 (2000); Campbell v. Allstate Ins. Co., 60 Cal. 2d 303, 307 (1963).  In such a case, the insurer would have to prove that if the insured had cooperated, there was a substantial likelihood the trier of fact would have found in the insured's favor.  Billington v. Interins. Exch. of S. Cal., 71 Cal. 2d 728, 737 (1969).  Because of this, prejudice resulting from an insured's alleged failure to cooperate cannot be determined until the outcome of the underlying case is known.  United Servs. Auto. Ass'n v. Martin, 120 Cal. App. 3d 963, 966 (1981) ("Logically, the required showing of prejudice cannot be made while the main tort action is still pending, its outcome uncertain, and therefore declaratory relief against the injured persons at this stage is inappropriate.").

-66-

Moreover, the California Supreme Court has rejected the concept of "reverse bad faith" asserted against a policyholder as a defense to coverage. See Kransco v. Amer. Empire Surplus Lines Ins. Co., 23 Cal. 4th 390, 407 (2000), as modified (July 26, 2000); see also Endurance Amer. Specialty Ins. Co. v. Lance-Kashian & Co., CV F 10–1284 LJO DLB, 2010 WL 3619476 (E.D. Cal. Sept. 13, 2010); Hale v. Provident Life & Acc. Ins. Co., 2003 WL 1510463 (Cal. Ct. App. Mar. 25, 2003). Indeed, Truck (through its coverage counsel) admits that such a claim cannot stand under California law. Hoyt Dep. at 126:10-16 ("Q. …you are aware that the California Supreme Court has rejected the concept of reverse bad faith as a defense [to] coverage in California, yes? A. I believe that is correct.").

Finally, the covenant of good faith and fair dealing implied into the Truck Policies requires any policy interpretation to be consistent with Truck's obligations—i.e., Truck must refrain from doing anything that would injure the Debtors' right to receive the benefits of the insurance agreement (Waller, 11 Cal. 4th at 36), requiring Truck to "'give at least as much consideration to the welfare of its insured as it gives to its own interests.'" Vu v. Prudential Property & Cas. Ins. Co., 26 Cal. 4th 1142, 1150 (2001) (citation omitted); Egan v. Mut. of Omaha Ins. Co., 24 Cal.3d 809, 818-19 (1979) ("For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does to its own."). Bankruptcy is not intended to relieve insurers of their contractual liabilities or to improve their position under their insurance contracts in the tort system.

In sum, as a matter of law, the Debtors' conduct in connection with and throughout these Reorganization Cases does not and has not violated any Asbestos Insurer Cooperation Obligations, including the Assistance and Cooperation Clause contained in the

-67-

Truck Policies, nor was such conduct a breach of any implied covenant of good faith and fair dealing in those policies.

### D. MODIFICATIONS TO THE PLAN.

The Modifications (i) do not adversely change, in any material respect, the treatment under the Plan of any Claims or Interests and (ii) comply in all respects with Bankruptcy Rule 3019.  Pursuant to section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, the Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of acceptances or rejections of the Plan under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims against or Interests in the Debtors be afforded an opportunity to change previously cast acceptances or rejections of the Plan as Filed with the Bankruptcy Court.  Disclosure of the Modifications through the Debtors' service of its motion to modify the Plan [D.I. 2342] and as made on the record at the Confirmation Hearing constitute due and sufficient notice thereof under the circumstances of the Reorganization Cases.  Accordingly, the Plan (as modified) is properly before the Court and all votes cast with respect to the Plan prior to the Modifications shall be binding and shall be deemed to be cast with respect to the Plan as modified.

### E. EXEMPTIONS FROM TAXATION.

Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp Tax or similar Tax:  (i) the creation of any Encumbrances; (ii) the making or assignment of any lease or sublease; (iii) the execution and implementation of the Asbestos Personal Injury Trust Agreement, including the creation of the Asbestos Personal Injury Trust and any transfers to or by the Asbestos Personal Injury Trust; (iv) any Restructuring Transaction; or (v) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation,

restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.

### F.      COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.

As set forth in Section I.G above, which is incorporated fully herein, the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code.

### G.      COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE.

As set forth in Section I.H above, which is incorporated fully herein, the Plan complies in all respects with the applicable requirements of section 524(g) of the Bankruptcy Code.

### H.      TRANSFER OF BOOKS AND RECORDS TO THE ASBESTOS PERSONAL INJURY TRUST.

Section IV.J. of the Plan provides that, prior to the Effective Date, the Debtors will establish a repository containing all their the books and records that are necessary for the defense of Asbestos Personal Injury Claims, and shall make that repository available to the Entities that are responsible for the processing or defense of Asbestos Personal Injury Claims, and that are entitled to review, copy or use such documents.  The transfer of these materials is essential to the Plan and to the implementation of the Asbestos Personal Injury Trust and the preservation of its assets.  (McChesney Decl. ¶ 49.)  To the extent the Debtors or Reorganized Debtors, as applicable, provide the Asbestos Personal Injury Trust access to any privileged books and records, such access shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records, and each of the Reorganized Debtors and the Asbestos

Personal Injury Trust shall retain the right to assert any applicable privilege with respect to such books and records.

## I. APPROVAL OF THE SETTLEMENTS AND RELEASES PROVIDED UNDER THE PLAN.

The settlement of certain estate claims set forth in section IV.R.2 of the Plan and the releases set forth in Section IV.R.3 of the Plan, including the releases of nondebtor parties pursuant to the general releases in Section IV.R.3.c, are (i) integral to the terms, conditions and settlements contained in the Plan, (ii) appropriate in connection with the Debtors' reorganization and (iii) supported by reasonable consideration.  In light of all of the circumstances, settlement of certain estate claims in Section IV.R.2 of the Plan and the releases in Section IV.R.3 of the Plan are fair, equitable and in the best interests of the Estates.

## III. CONCLUSION.

For the foregoing reasons, the Bankruptcy Court submits these Proposed Findings of Fact and Conclusions of Law to the District Court and recommends confirmation of the Plan. A proposed form of Confirmation Order is attached to these Proposed Findings of Fact and Conclusions of Law as Annex A.

These Findings and Conclusions have been signed electronically.  The Judge's signature and the Court's seal appear at the top of the document.

United States Bankruptcy Court

NAI-1514152678v6